537 S.E.2d 882

Paul MITCHELL, as Executor of
the Estate of Mary S. Mitchell,
Plaintiff Below, Appellant,

v.

Anthony George BROADNAX, Defendant
Below, Appellee.

Naomi S. Mitchell and Geraldine
O'Dell, Plaintiffs Below,

v.

Anthony Broadnax, Defendant Below.

No. 25539.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 25, 2000.

Decided Feb. 18, 2000.

Concurring Opinion of Justice Starcher
April 21, 2000.

Concurring and Dissenting Opinion
of Justice McGraw Oct. 20, 2000.

Roslyn Clark–Payne, Wilbert A. Payne, Beckley, West Virginia, Attorneys for the Appellant.

Mark A. Bramble, Brent K. Kesner, Ellen R. Archibald, Kesner, Kesner & Bramble, Charleston, West Virginia, Attorneys for the Appellee, Anthem Casualty Insurance Company.

Wesley W. Metheney, Paul T. Farrell, Jr., Wilson, Frame, Benninger & Metheney, PLLC, Morgantown, West Virginia, Barry Hill, Law Offices of Barry Hill, Wheeling, West Virginia, Attorneys for Amicus Curiae, West Virginia Trial Lawyers Association.

DAVIS, Justice.

The appellant herein and plaintiff below, Paul Mitchell [hereinafter "Mitchell"], as executor of the estate of Mary S. Mitchell [hereinafter "Ms. Mitchell" or "the decedent"], appeals from an April 15, 1998, order entered by the Circuit Court of Raleigh County. In that order, the circuit court awarded summary judgment and declaratory judgment to the appellee herein and defendant below, Anthem Casualty Insurance Company [hereinafter "Anthem"],[1] and ruled that Anthem was obligated to pay to Mitchell, under the "owned but not insured" exclusion contained in the decedent's policy of motor vehicle insurance, uninsured motorist [hereinafter "UM"] benefits equal to the statutorily required minimum limits of such coverage, i.e., $20,000. See W. Va.Code § 17D–4–2 (1979) (Repl.Vol.1996); W. Va.Code § 33–6–31(b) (1995) (Repl.Vol.1996). Mitchell appealed the circuit court's decision to this Court and argued that the "owned but not insured" exclusion should be declared void and that he should be permitted to recover the full amount of uninsured motorist benefits provided for in the decedent's Anthem policy, i.e., $300,000. We previously upheld the circuit court's order in a per curiam opinion filed on July 16, 1999. See Mitchell v. Broadnax, No. 25539 (W.Va. July 16, 1999) (per curiam). Following Mitchell's petition for rehearing, we concluded that justice required us to revisit the public policy attending the enforcement of "owned but not insured" exclusions to motor vehicle insurance coverage, noting in our August 31, 1999, rehearing order that our reconsideration of this case would be limited to the "public policy" issue. Upon a second review of the pertinent authorities, the record presented for appellate review, and the parties' arguments, we conclude that we cannot definitively determine whether the circuit court's ruling was in error. Our decision of this case is hindered by the absence, in the appellate record, of two vital pieces of information: (1) evidence regarding whether Anthem, in incorporating the exclusionary language into Ms. Mitchell's policy, charged her a premium consistent with such limitation of coverage and (2) any indication that the circuit court considered whether Anthem had met the statutory requirements of W. Va.Code § 33–6–31(k) (1995) (Repl.Vol.1996) requisite to incorporating such a policy exclusion. Accordingly, we vacate the ruling of the circuit court and remand the matter for further proceedings consistent with this opinion.

## I.

## FACTUAL AND PROCEDURAL HISTORY

The facts of this case are largely undisputed by the parties. On November 9, 1996, Ms. Mitchell; her daughter, Naomi Mitchell [hereinafter "Naomi"]; and Geraldine O'Dell [hereinafter "Ms. O'Dell"] were involved in an automobile accident in Raleigh County, West Virginia, when the 1989 Pontiac Grand Am in which they were traveling was hit by a 1983 Cadillac driven by Anthony George Broadnax [hereinafter "Broadnax"], an uninsured motorist[2] who was driving without a

1. West Virginia law permits insurers providing uninsured and/or underinsured motorist coverage(s) to participate in lawsuits regarding such insurance in either their own name or "in the name of the owner, or operator, or both, of the uninsured or underinsured motor vehicle." W. Va.Code § 33–6–31(d) (1995) (Repl.Vol.1996). See also Syl. pt. 4, State ex rel. State Farm Mut. Auto. Ins. Co. v. Canady, 197 W.Va. 107, 475 S.E.2d 107 (1996) ("Pursuant to West Virginia Code § 33–6–31(d) (Supp.1995), an uninsured motorist carrier is entitled to appear and defend in its own name rather than that of the uninsured tortfeasor even when policy defenses raising issues of coverage are not asserted by the carrier.").

2. The parties do not dispute that Broadnax was an uninsured motorist: (1) he had no motor

vehicle insurance at the time of the accident; (2) his mother, who owned the Cadillac he was driving, had specifically denied him permission and consent to drive this vehicle; and (3) Broadnax was not residing in his mother's household at the time of the collision. Based upon these various facts, the circuit court ruled that Broadnax was an uninsured motorist, within the meaning ascribed to that term by Metropolitan Property & Liability Insurance Co. v. Acord, 195 W.Va. 444, 465 S.E.2d 901 (1995). See Syl. pt. 2, id. ("Consistent with the omnibus clause of West Virginia Code § 33–6–31(a) (1992), an insurer may properly deny liability coverage where the express terms of an automobile insurance policy provide that in order for liability coverage to exist, a driver, who is not otherwise insured under the policy, must have received the named insured's permission to use the automobile, and

valid driver's license.[3] Ms. Mitchell and Naomi jointly owned the Grand Am,[4] which was insured by a policy of motor vehicle insurance issued by Kentucky National Insurance Company [hereinafter "Kentucky National"].[5] In addition, Ms. Mitchell, who was a passenger in the Grand Am at the time of the accident, held a policy of motor vehicle insurance for her separately owned vehicle, a 1981 Buick Century, which policy had been issued by Anthem.[6] As a result of the accident, Ms. Mitchell sustained numerous injuries, and it is averred that these injuries contributed to her subsequent death in late March, 1997.

After unsuccessful attempts to recover the UM benefits provided by the Kentucky National and Anthem policies, Paul Mitchell, on behalf of Ms. Mitchell,[7] filed this action on March 24, 1997, in the Circuit Court of Raleigh County, seeking to collect the UM benefits provided by both the Kentucky National and Anthem policies.[8] Kentucky National

ultimately settled with Mitchell and tendered the full policy limits of UM coverage, i.e., $100,000.[9] Anthem, however, denied coverage based upon an "owned but not insured" exclusion contained in that policy, which reads:

> We do not provide Uninsured Motorists Coverage under this endorsement for property damage or bodily injury sustained by any person while occupying, or when struck by, any motor vehicle owned by you or any family member which is not insured for Uninsured Motorists Coverage under this policy. This includes a trailer of any type used with that vehicle.

Following Anthem's motion for summary judgment and declaratory judgment, the circuit court, in an order entered April 15, 1998, found the exclusion to be valid and enforceable above the minimum statutory limits of UM coverage, consistent with our recent holding in *Imgrund v. Yarborough*, 199 W.Va. 187, 483 S.E.2d 533 (1997).[10] The

---

said driver lacked the express or implied permission of the named insured prior to using the vehicle."). *See also* W. Va.Code § 33–6–31(c) (1995) (Repl.Vol.1996) (defining "uninsured motor vehicle" as "a motor vehicle as to which there is no: (i) Bodily injury liability insurance and property damage liability insurance both in the amounts specified by section two, article four, chapter seventeen-d of this code, as amended from time to time; or (ii) there is such insurance, but the insurance company writing the same denies coverage thereunder; or (iii) there is no certificate of self-insurance issued in accordance with the provisions of said section").

3. It is further alleged that, at the time of the wreck, Broadnax was driving under the influence of alcohol. For statutes criminalizing substance-impaired driving, see generally W. Va. Code § 17B–4–3 (1994) (Repl.Vol.1996) and W. Va.Code § 17C–5–2 (1996) (Repl.Vol.1996).

4. They also resided in the same household.

5. The Kentucky National policy insuring the Grand Am carried UM coverage of $100,000 per person/$300,000 per occurrence. Although the parties variously refer to this insurer as Kentucky Central Insurance Company and Kentucky National Insurance Company, for ease of reference we will use the company's post-merger name of Kentucky National. *See Bailey v. Kentucky Nat'l Ins. Co.*, 201 W.Va. 220, 222 n. 2, 496 S.E.2d 170, 172 n. 2 (1997).

6. The UM coverage limits of the Anthem policy were $300,000 per person/$300,000 per occurrence.

7. When the complaint in this action was initially filed, Mitchell served as power of attorney for Ms. Mitchell. Following Ms. Mitchell's death, the complaint was amended to reflect Mitchell's current status as executor of her estate.

8. Naomi and Ms. O'Dell also brought suit against Broadnax for injuries they suffered and damages they sustained as a result of the automobile accident of November 9, 1996. During the proceedings below, the circuit court consolidated their action with the action filed by Mitchell. The instant appeal concerns only Mitchell's suit, as executor of Ms. Mitchell's estate.

9. See *supra* note 5 describing coverage limits of Kentucky National policy.

10. The holding relied upon by the circuit court provides:

> An "owned but not insured" exclusion to *uninsured* motorist coverage is valid and enforceable above the mandatory limits of *uninsured* motorist coverage required by W. Va. Code §§ 17D–4–2 (1979) (Repl.Vol.1996) and 33–6–31(b) (1988) (Supp.1991). To the extent that an "owned but not insured" exclusion attempts to preclude recovery of statutorily mandated minimum limits of *uninsured* motorist coverage, such exclusion is void and ineffective consistent with this Court's prior holding in Syllabus Point 2 of *Bell v. State Farm Mutual Automobile Insurance Company*, 157 W.Va. 623, 207 S.E.2d 147 (1974).

Syl. pt. 4, *Imgrund v. Yarborough*, 199 W.Va. 187, 483 S.E.2d 533 (1997).

court also ruled that Anthem's "liability to the plaintiff is limited to the statutory minimum limit of uninsured motorist benefits of $20,000.00, per person."[11] Thereafter, Anthem tendered these benefits to Mitchell,[12] and Mitchell appealed to this Court.

In our first decision of Mitchell's appeal, which was filed on July 16, 1999, and rendered per curiam, we upheld the circuit court's ruling. *See Mitchell v. Broadnax,* No. 25539 (W.Va. July 16, 1999) (per curiam). Upon Mitchell's petition for rehearing, we determined the need to further examine the public policy issues inherent in the enforcement of "owned but not insured" exclusions to motor vehicle coverage, based largely upon our conclusion that the parties had not adequately briefed this issue in their original appellate briefs.[13] Accordingly, in our August 31, 1999, order granting rehearing, we instructed the parties that our reconsideration of this case would be limited to a consideration of "whether the 'owned but not insured' exclusion is against public policy as set forth in West Virginia statutes and/or in case law," and requested their briefs on rehearing to address the same. Our determination of that narrow issue follows.

## II.

### STANDARD OF REVIEW

■ On appeal to this Court, Mitchell challenges the propriety of the circuit court's decision to award Anthem summary judg-

---

**11.** The statutory minimum limits of UM coverage applicable to the facts underlying the instant appeal are set forth in W. Va.Code § 17D–4–2 (1979) (Repl.Vol.1996) and W. Va.Code § 33–6–31(b) (1995) (Repl.Vol.1996). W. Va.Code § 33–6–31(b) requires motorists to carry UM coverage in an amount dictated by the financial responsibility laws of this State:

> (b) Nor shall any such policy or contract [of motor vehicle insurance] be so issued or delivered unless it shall contain an endorsement or provisions undertaking to pay the insured all sums which he shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle, within limits which shall be no less than the requirements of section two, article four, chapter seventeen-d of this code, as amended from time to time
>
> . . . .

W. Va.Code § 17D–4–2, one of the statutes regulating motorists' financial responsibility, requires an owner or operator of a motor vehicle to possess insurance in a minimum amount of

> twenty thousand dollars because of bodily injury to or death of one person in any one accident, and, subject to said limit for one person, in the amount of forty thousand dollars because of bodily injury to or death of two or more persons in any one accident, and in the amount of ten thousand dollars because of injury to or destruction of property of others in any one accident.

**12.** The parties disagree as to when Anthem actually tendered payment to Mitchell and as to whether such payment was voluntarily made by Anthem or occurred as a result of the circuit court's order directing such payment be made.

**13.** As we previously have stated in other opinions requiring rehearing, "we express our concern over not resolving this case in the prior ... opinion[]. However, ... '[w]isdom too often never comes, and so one ought not to reject it merely because it comes late.' " *Hosaflook v. Consolidation Coal Co.,* 201 W.Va. 325, 329, 497 S.E.2d 174, 178 (1997) (quoting *Henslee v. Union Planters Nat'l Bank & Trust Co.,* 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259, 264 (1949) (per curiam) (Frankfurter, J., dissenting)). In accepting this matter for further consideration, though, we wish to caution the litigants that, in future cases, they must strive to adhere to the Rules of Appellate Procedure governing proceedings in this Court. *See* W. Va. R.App. P. 10(d) (requiring appellant's brief to "follow the same form as the petition for appeal"); W. Va. R.App. P. 3(c) (commanding petition for appeal to include "1. The kind of proceeding and nature of the ruling in the lower tribunal[;] 2. A statement of the facts of the case[;] 3. The assignments of error relied upon on appeal and the manner in which they were decided in the lower tribunal[; and] 4. Points and authorities relied upon, a discussion of law, and the relief prayed for."). *See also Hanlon v. Logan County Bd. of Educ.,* 201 W.Va. 305, 310 n. 17, 496 S.E.2d 447, 452 n. 17 (1997) (" 'Failure to [heed the applicable court rules] not only wastes the precious and limited resources of this Court, but also those of the lawyers and their clients. *We do not wish to be perceived as "sticklers, precisians, nitpickers, or sadists. But in an era of swollen appellate dockets, courts are entitled to insist" on diligence and good faith efforts from the practicing bar so that the appellate decisional process can proceed as it should.'* " (emphasis in original) (quoting *Coleman v. Sopher,* 194 W.Va. 90, 96, 459 S.E.2d 367, 373 (1995) (quoting *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1224 (7th Cir.1995)))). Our review of the briefs on rehearing, as well as of the original appellate briefs filed in this case, indicates that they contain little more than bald assertions regarding the public policy considerations discussed in this opinion with scant supportive authority for such contentions.

ment and declaratory judgment. Typically, " ' "[a] circuit court's entry of summary judgment is reviewed de novo." Syl. Pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994).' Syllabus point 1, *McGraw v. St. Joseph's Hospital,* 200 W.Va. 114, 488 S.E.2d 389 (1997)." Syl. pt. 2, *Wickland v. American Travellers Life Ins. Co.* ., 204 W.Va. 430, 513 S.E.2d 657 (1998). Likewise, we afford plenary review to a declaratory judgment award: " '[a] circuit court's entry of a declaratory judgment is reviewed de novo.' Syllabus Point 3, *Cox v. Amick,* 195 W.Va. 608, 466 S.E.2d 459 (1995)." Syl. pt. 1, *Anderson v. Wood,* 204 W.Va. 558, 514 S.E.2d 408 (1999).

 In addition to the procedural posture of this case, we also must consider the legal issue at the heart of this matter in determining the applicable standard of review. As we previously have upheld the validity of exclusions to motor vehicle insurance coverage generally, *see* Syl. pt. 3, *Deel v. Sweeney,* 181 W.Va. 460, 383 S.E.2d 92 (1989),[14] and of "owned but not insured" exclusions specifically, *see* Syl. pt. 4, *Imgrund v. Yarborough,* 199 W.Va. 187, 483 S.E.2d 533 (1997),[15] we are primarily concerned in this appeal with the public policy considerations attending the incorporation of such exclusions into policies of motor vehicle insurance. Generally, " '[a] determination of the existence of public policy in West Virginia is a question of law . . . .' Syllabus point 1, [in part,] *Cordle v. General Hugh Mercer Corp.,* 174 W.Va. 321, 325 S.E.2d 111 (1984)." Syl. pt. 1, in part, *Page v. Columbia Natural Resources, Inc.,* 198 W.Va. 378, 480 S.E.2d 817 (1996). Accordingly, the appropriate standard of review for our deliberation and

determination of the public policy issue also is plenary:

" 'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995)." Syllabus point 2, *Webster County Commission v. Clayton,* 206 W.Va. 107, 522 S.E.2d 201 (1999).

Syl. pt. 1, *State ex rel. McGraw v. Combs Services,* 206 W.Va. 512, 526 S.E.2d 34 (1999). Having ascertained the relevant standards of review, we proceed to consider and decide the parties' arguments.

## III.

## DISCUSSION

With this appeal, we once again are invited to consider the ever-tumultuous realm of motor vehicle insurance law and insurer-incorporated exclusions to such coverage.[16] In determining whether enforcement of the "owned but not insured" exclusion [17] at issue herein violates the public policy of this State, it is first necessary to review the historical underpinnings which have shaped such exclusions.

The seminal case of *Bell v. State Farm Mutual Automobile Insurance Co.,* 157 W.Va. 623, 207 S.E.2d 147 (1974), was the first of our decisions to definitively consider the validity of "owned but not insured" exclusions. In that case, plaintiff Bell was involved in an accident with an uninsured motorist while riding her motorcycle, which she

---

**14.** See *infra* Section III for the text of Syllabus point 3 of *Deel v. Sweeney,* 181 W.Va. 460, 383 S.E.2d 92 (1989).

**15.** See *supra* note 10 and *infra* Section III for the pertinent holding of *Imgrund v. Yarborough,* 199 W.Va. 187, 483 S.E.2d 533 (1997).

**16.** At this juncture, we acknowledge and appreciate the appearance of Amicus Curiae herein, the West Virginia Trial Lawyers Association [hereinafter "the Association"]. We will consider the Association's arguments in connection with the party to whom they relate.

**17.** Such an exclusion is typically described as follows:

an owned but not insured exclusion in an uninsured motorist policy generally excludes uninsured motorist coverage for bodily injury sustained by a person covered under the policy while occupying a motor vehicle owned by an insured or relative living in the same household, but not insured for uninsured motorist coverage under the policy.

Shannon M. McDonough, Note, *Exclusions for Owned but not Insured in Uninsured Motorist Provisions—What are States really Driving at in their Decisions?,* 43 Drake L.Rev. 917, 918 (1995) (footnote omitted).

owned but for which she did not have insurance. Following the accident, Bell attempted to collect uninsured motorist [hereinafter "UM"] benefits under two separate policies of motor vehicle insurance. The first such policy insured a Fiat automobile which Bell also owned. The second policy had been purchased by her father, in whose household Bell resided, for his owned vehicle. Both of these policies, however, contained an "owned but not insured" exclusion, which the insurer claimed prevented Bell from recovering UM benefits thereunder in connection with her motorcycle accident. *Bell,* 157 W.Va. at 624–26, 207 S.E.2d at 148–49.

■ Issuing its opinion, the Court ultimately found the "owned but not insured" exclusions to be void and inoperative to preclude Bell's recovery of UM benefits under her and her father's policies of insurance. To reach this conclusion, the Court first examined the public policy attending this State's motor vehicle insurance laws:

As automobile transportation has attained a pervasive status in the organization of society and commerce, the State has a legitimate interest in assuring that the burden of loss in owning, operating, and maintaining automobiles be justly and equitably distributed. For this reason the Legislature has enacted the West Virginia Uninsured Motorist Law, *Code,* 33–6–31, as amended, which contains specific requirements applicable to insurance underwriters. This statute regulates, in part, the relationship between an insured and the insurer, and, therefore, an insurance contract cannot alter the terms as provided by the statute. . . .

*Bell,* 157 W.Va. at 627, 207 S.E.2d at 150. Recognizing the State's preeminent interest in protecting its citizens from the financial burdens of collisions with uninsured motorists, this Court held that policies of motor vehicle insurance are required to comply with the statutory requirements of W. Va.Code § 33–6–31.

The Uninsured Motorist Law, Chapter 33, Article 6, Section 31, *Code of West Virginia,* 1931, as amended, governs the relationship between an insured and insurer and provisions within a motor vehicle insurance policy which conflict with the requirements of the statute, either by adding to or taking away from its requirements are void and ineffective.

Syl. pt. 1, *Bell,* 157 W.Va. 623, 207 S.E.2d 147. Then, invalidating the "owned but not insured" exclusion at issue in that appeal, the *Bell* Court ostensibly found that such a limitation of coverage conflicted with the statutory requirements requiring UM insurance:

An exclusionary clause within a motor vehicle insurance policy issued by a West Virginia licensed insurer which excludes uninsured motorist coverage for bodily injury caused while the insured is occupying an owned-but-not-insured motor vehicle is void and ineffective under Chapter 33, Article 6, Section 31, *Code of West Virginia,* 1931, as amended.

Syl. pt. 2, *id.* Therefore, the "owned but not insured" exclusions were deemed to be void, and Bell was permitted to recover her requested UM benefits.

Following *Bell,* the legal history of motor vehicle exclusions momentarily veered off the path of judicial precedent and turned sharply towards the legislative arena. In 1979, the West Virginia Legislature substantially amended the UM law of this State by adding to W. Va.Code § 33–6–31 a new subsection (k). This amendment, which expressly authorized insurers to incorporate exclusions to coverage in their policies of motor vehicle insurance, provided:

(k) Nothing contained herein shall prevent any insurer from also offering benefits and limits other than those prescribed herein, *nor shall this section be construed as preventing any insurer from incorporating in such terms, conditions and exclusions as may be consistent with the premium charged.*[18]

---

18. Although W. Va.Code § 33–6–31 has been amended many times since the Legislature's addition of subsection (k) thereto, the text of subsection (k) has not changed since its original enactment. *See, e.g.,* W. Va.Code § 33–6–31(k) (1998) (Supp.1999); W. Va.Code § 33–6–31(k) (1995) (Repl.Vol.1996).

W. Va.Code § 33–6–31(k) (1979) (Repl.Vol. 1982) (emphasis added) (footnote added).

Thereafter, this Court was presented with another case involving "owned but not insured" exclusions to motor vehicle insurance, *Deel v. Sweeney*, 181 W.Va. 460, 383 S.E.2d 92 (1989). Unlike the plaintiff in *Bell*, however, Deel attempted to recover underinsured motorist [hereinafter "UIM"] benefits. Plaintiff Deel was involved in an accident with Sweeney. Sweeney was an uninsured motorist, but the vehicle he was driving at the time of the accident, which was owned by Ramsey, was insured. Additionally, Deel owned the vehicle he was driving at the time of the accident and insured the same, but he did not carry UIM coverage. After recovering insurance benefits from Ramsey's insurer, Deel attempted to recover UIM benefits from his father's policy of motor vehicle insurance.[19] This policy, like the ones at issue in *Bell*, contained an "owned but not insured" exclusion upon which the issuing insurer based its declination of UIM coverage. *Deel*, 181 W.Va. at 461–62, 383 S.E.2d at 93–94.

In deciding *Deel*, this Court considered its prior decision in the *Bell* case and reiterated those tenets by holding that "[s]tatutory provisions mandated by the Uninsured Motorist Law, *W. Va.Code* § 33–6–31 [1988] may not be altered by insurance policy exclusions." Syl. pt. 1, *Deel*, 181 W.Va. 460, 383 S.E.2d 92. Despite this admonition, the Court recognized the substantial impact of the Legislature's adoption of subsection (k) to W. Va.Code § 33–6–31, the practical effect of which was the allowance of motor vehicle insurance exclusions.

Insurers may incorporate such terms, conditions and exclusions in an automobile insurance policy as may be consistent with the premium charged, so long as any such exclusions do not conflict with the spirit and intent of the uninsured and underinsured motorist statutes.

Syl. pt. 3, *Deel v. Sweeney*, 181 W.Va. 460, 383 S.E.2d 92. Based upon this permissive provision and the fact that UIM coverage is optional, and not mandatory, as is the case with UM coverage, 181 W.Va. at 463, 383 S.E.2d at 95, the *Deel* Court held the "owned but not insured" exclusion valid and quashed Deel's attempt to recover UIM benefits under his father's insurance policy.

This brings us now to our most recent decision impacting the viability of "owned but not insured" exclusions, *Imgrund v. Yarborough*, 199 W.Va. 187, 483 S.E.2d 533 (1997).[20] The facts of *Imgrund* are akin to those presented by *Bell* and *Deel*. Imgrund was involved in an accident while he was riding a motorcycle which he owned and for which he had purchased motor vehicle insurance. Yarborough, the other driver involved in the accident, was uninsured. Imgrund successfully recovered UM benefits from his own insurance policy, and, as he was living with his parents at the time of the accident, attempted to collect additional benefits from his parents' policy of motor vehicle insurance, which insured their two vehicles. Again, however, the policy under which the plaintiff sought to recover contained an "owned but not insured" exclusion to coverage, and the issuing insurer denied coverage on this basis. 199 W.Va. at 188–89, 483 S.E.2d at 534–35.

When faced with the question of the exclusion's validity in *Imgrund*, we were forced to reconcile our prior decisions in this field. On the one hand, *Bell* expressly denied the validity of "owned but not insured" exclusions, while on the other hand, *Deel* acknowledged the Legislature's allowance of motor vehicle insurance exclusions and found such a limitation to be valid and effective in denying UIM benefits. 199 W.Va. at 192, 483 S.E.2d at 538. Appreciating this inconsistency, this Court in *Imgrund* carefully balanced our conflicting precedents while adhering to the statutory provisions governing UM insurance and enabling insureds to

---

19. Deel was residing in his father's household at the time of the accident. 181 W.Va. at 461, 383 S.E.2d at 93.

20. Although our prior opinions in *Alexander v. State Automobile Mutual Insurance Co.*, 187 W.Va. 72, 415 S.E.2d 618 (1992), and *Ward v.*

*Baker*, 188 W.Va. 569, 425 S.E.2d 245 (1992), touched upon "owned but not insured" exclusions, we do not discuss these cases at length herein as they did not result in a significant expansion of the law in this field.

purchase optional UM coverage above the statutory minimum limits thereof.

An "owned but not insured" exclusion to *uninsured* motorist coverage is valid and enforceable above the mandatory limits of *uninsured* motorist coverage required by W. Va.Code §§ 17D–4–2 (1979) (Repl.Vol. 1996) and 33–6–31(b) (1988) (Supp.1991). To the extent that an "owned but not insured" exclusion attempts to preclude recovery of statutorily mandated minimum limits of *uninsured* motorist coverage, such exclusion is void and ineffective consistent with this Court's prior holding in Syllabus Point 2 of *Bell v. State Farm Mutual Automobile Insurance Company,* 157 W.Va. 623, 207 S.E.2d 147 (1974).

Syl. pt. 4, *Imgrund v. Yarborough,* 199 W.Va. 187, 483 S.E.2d 533. We therefore found the "owned but not insured" exclusion in Imgrund's parents' policy to be valid.

Having recounted the historical treatment of "owned but not insured" exclusions to motor vehicle insurance coverage in this State, we turn our attention to the facts and circumstances of the instant appeal. In this case, like *Imgrund* and *Bell,* the plaintiff seeking to recover UM benefits was involved in an accident with an uninsured motorist. *See Imgrund,* 199 W.Va. at 188, 483 S.E.2d at 534; *Bell,* 157 W.Va. at 624, 207 S.E.2d at 148. Furthermore, Ms. Mitchell, who partly-owned the accident vehicle, like Imgrund, who wholly-owned the accident vehicle, recovered the full policy limits of UM benefits from the insurance company providing coverage for the vehicle involved in the collision. *See Imgrund,* 199 W.Va. at 189, 483 S.E.2d at 535. Unlike *Imgrund,* however, and more akin to the insurance facts of *Bell,* Ms. Mitchell also sought to collect benefits from her own policy of insurance which insured her separately-owned vehicle, but was precluded from doing so by the "owned but not insured" exclusion contained in that policy.[21] *See Bell,* 157 W.Va. at 625–26, 207 S.E.2d at 149. As we have yet to consider this particular fact pattern in light of the Legislature's allowance of insurance policy exclusions pur-

suant to W. Va.Code § 33–6–31(k), we must therefore determine whether enforcement of the "owned but not insured" exclusion, under these circumstances, violates the public policy of this State.

■■■ In deciding whether a public policy violation is imminent, we consider both the facts and the law relevant to our inquiry. Stated otherwise, decision of a public policy issue is a legal query, but such a determination is made on a case-by-case basis: " ' "[i]t is a question of law which the court must decide in light of the particular circumstances of each case." ' " *Morris v. Consolidation Coal Co.,* 191 W.Va. 426, 433 n. 5, 446 S.E.2d 648, 655 n. 5 (1994) (quoting *Cordle v. General Hugh Mercer Corp.,* 174 W.Va. at 325, 325 S.E.2d at 114 (quoting *Allen v. Commercial Cas. Ins. Co.,* 131 N.J.L. 475, 477–78, 37 A.2d 37, 39 (1944) (citations omitted))). Where public policy issues are concerned,

> "[t]he rule of law, most generally stated, is that 'public policy' is that principle of law which holds that 'no person can lawfully do that which has a tendency to be injurious to the public or against public good ...' even though 'no actual injury' may have resulted therefrom in a particular case 'to the public.' ...
>
> "The sources determinative of public policy are, among others, our federal and state constitutions, our public statutes, our judicial decisions, the applicable principles of the common law, the acknowledged prevailing concepts of the federal and state governments relating to and affecting the safety, health, morals and general welfare of the people for whom government—with us—is factually established."

*Id.* With these precepts in mind, then, we must carefully weigh the factual and legal components of the instant appeal.

At the center of the instant controversy is the policy of motor vehicle insurance provided by Anthem to Ms. Mitchell and containing a limitation to her UM coverage in the form

21. See *supra* Section I for the text of the "owned but not insured" exclusion contained in Ms. Mitchell's Anthem policy.

of an "owned but not insured" exclusion.[22] The mandatory nature of UM insurance is well-established in the law of this State. W. Va.Code § 33–6–31(b); Syl. pt. 1, in part, *Miller v. Lambert,* 195 W.Va. 63, 464 S.E.2d 582 (1995) ("Uninsured motorist insurance coverage is mandatory."); *Deel,* 181 W.Va. at 463, 383 S.E.2d at 95 (same). " 'The primary, if not sole purpose of mandatory uninsured motorist coverage is to protect innocent victims from the hardships caused by negligent, financially irresponsible drivers.' " *Perkins v. Doe,* 177 W.Va. 84, 87, 350 S.E.2d 711, 714 (1986) (quoting *Lusk v. Doe,* 175 W.Va. 775, 779, 338 S.E.2d 375, 380 (1985), *overruled on other grounds by Hamric v. Doe,* 201 W.Va. 615, 499 S.E.2d 619 (1997)). In this regard, W. Va.Code § 33–6–31

> seeks to assure at least minimum relief from the consequences of a loss caused by an uninsured motorist. Because every citizen is exposed to the risk of loss, the Legislature has provided through the uninsured motorist statute that the burden of loss should be distributed among all owners of insured motor vehicles registered in West Virginia....

*Bell,* 157 W.Va. at 627, 207 S.E.2d at 150. Given that the purpose of UM insurance is to alleviate the financial burdens of West Virginia motorists who are involved in accidents with other motorists who are uninsured,[23] we have specifically held that "[t]he uninsured motorist statute, West Virginia Code § 33–6–31 (Supp.1986), is remedial in nature and, therefore, must be construed liberally in order to effect its purpose." Syl. pt. 7, *Perkins v. Doe,* 177 W.Va. 84, 350 S.E.2d 711.

 It is precisely this same UM statute upon which our prior decisions validating "owned but not insured" exclusions have based their rulings. *See* Syl. pt. 4, *Imgrund,* 199 W.Va. 187, 483 S.E.2d 533; Syl. pt. 3, *Deel,* 181 W.Va. 460, 383 S.E.2d 92. With specific regard to the public policy issue at hand, subsection (k) of W. Va.Code § 33–6–31 permits insurers to "incorporat[e] in [policies of motor vehicle insurance] such terms, conditions and exclusions as may be consistent with the premium charged." Because a "public statute[ ]" may serve as a source of authority for public policy issues, *see Morris,* 191 W.Va. at 433 n. 5, 446 S.E.2d at 655 n. 5, a detailed analysis of this permissive provision would be instructive to our inquiry.

> " 'The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.' Syllabus point 1, *Smith v. State Workmen's Compensation Commissioner,* 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syllabus point 6, *State ex rel. ACF Industries, Inc. v. Vieweg,* 204 W.Va. 525, 514 S.E.2d 176 (1999).

Syl. pt. 3, *Daily Gazette Co., Inc. v. West Virginia Dev. Office,* 206 W.Va. 51, 521 S.E.2d 543 (1999). Moreover, when we interpret a statutory provision, this Court is bound to apply, and not construe, the enactment's plain language. Syl. pt. 4, *Daily Gazette Co., Inc. v. West Virginia Dev. Office,* 206 W. Va. 51, 521 S.E.2d 543 (" ' "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. Pt. 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951).' Syllabus point 1, *State v. Jarvis,* 199 W.Va. 635, 487 S.E.2d 293 (1997)."); *DeVane v. Kennedy,* 205 W.Va. 519, 529, 519 S.E.2d 622, 632 (1999) ("Where the language of a statutory provision is plain, its terms should be applied as written and not construed." (citations omitted)). Although a provision's language may be plain, there nevertheless may arise circumstances in which the plain language does not speak completely on the subject to which it is addressed. Therefore,

> "[t]hat which is necessarily implied in a statute, or must be included in it in order to make the terms actually used have effect, according to their nature and ordinary meaning, is as much a part of it as if it had been declared in express terms." *Syllabus* point 14., *State v. Harden,* 62 W.Va. 313, 58 S.E. 715 (1907).

---

**22.** For the exclusionary language contained in the Anthem policy, see *supra* Section I.

**23.** See *supra* note 2 for authorities defining "uninsured motorist" and "uninsured motor vehicle."

Syl. pt. 4, *Smith v. State Workmen's Compensation Comm'r*, 159 W.Va. 108, 219 S.E.2d 361. Finally,

> "[i]t is the duty of a court to construe a statute according to its true intent, and give to it such construction as will uphold the law and further justice. It is well the duty of a court to disregard a construction, though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity." Syl. pt. 2, *Click v. Click*, 98 W.Va. 419, 127 S.E. 194 (1925).

Syl. pt. 2, *Pristavec v. Westfield Ins. Co.*, 184 W.Va. 331, 400 S.E.2d 575 (1990).

 Reviewing the pertinent language of subsection (k), we are convinced that the language states, in plain and comprehensible terms, that an insurer may include in a policy of motor vehicle insurance an exclusion. *See* W. Va.Code § 33–6–31(k); Syl. pt. 3, *Deel*, 181 W.Va. 460, 383 S.E.2d 92. This language further provides, in less certain terms, that such an exclusion must be "consistent with the premium charged" for such coverage. Inherent in this requirement, then, is the heretofore silent prerequisite that an insurance policy may contain an exclusion only if the issuing insurer has "appropriately adjusted" the corresponding premiums, thereby ensuring that the exclusion will be "consistent with the premium charged." In other words, just as "[a] contract for greater benefits generally justifies a greater premium," *Deel*, 181 W.Va. at 463, 383 S.E.2d at 95, so does a contract for benefits which have been reduced through the inclusion of an exclusion to coverage warrant a reduced premium. This interpretation also is consistent with the correlative statutory provision mandating that premiums be "appropriately adjusted" with respect to variable UM and UIM coverage limits. *See* W. Va.Code § 33–6–31(b). *See also* Syl. pt. 4, in part, *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997) ("In ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation." (internal quotations and citations omitted)); Syl. pt. 2, in part, *Mills v. Van Kirk*, 192

W.Va. 695, 453 S.E.2d 678 (1994) ("To determine the true intent of the legislature, courts are to examine the statute in its entirety and not select 'any single part, provision, section, sentence, phrase or word.' Syllabus Point 3, in part, *Pristavec v. Westfield Ins. Co.*, 184 W.Va. 331, 400 S.E.2d 575 (1990)."); Syl. pt. 1, *Parkins v. Londeree*, 146 W.Va. 1051, 124 S.E.2d 471 (1962) (same). To construe the language of subsection (k) otherwise would produce a result contrary to the express legislative intention that UM provisions are remedial in nature and should be liberally construed in favor of the insured. *See* Syl. pt. 2, *Pristavec*, 184 W.Va. 331, 400 S.E.2d 575; Syl. pt. 7, *Perkins v. Doe*, 177 W.Va. 84, 350 S.E.2d 711. Accordingly, we hold that when an insurer incorporates, into a policy of motor vehicle insurance, an exclusion pursuant to W. Va.Code § 33–6–31(k) (1995) (Repl. Vol.1996), the insurer must adjust the corresponding policy premium so that the exclusion is "consistent with the premium charged." As a corollary to this holding, we reiterate our admonition in *Deel* that such exclusions must "not conflict with the spirit and intent of the uninsured and underinsured motorist statutes." Syl. pt. 3, *Deel*, 181 W.Va. 460, 383 S.E.2d 92.

 At this juncture, we wish also to clarify our prior holdings, particularly in *Deel* and in *Imgrund*, wherein we found exclusions to policies of motor vehicle insurance to be statutorily permissible. *See* Syl. pt. 4, *Imgrund*, 199 W.Va. 187, 483 S.E.2d 533; Syl. pt. 3, *Deel*, 181 W.Va. 460, 383 S.E.2d 92. As is customary with the interpretation of legislative enactments, a finding that a particular provision is legally sound presupposes that the actor, whose conduct the statute was designed to govern, has satisfied the requirements thereof. Therefore, we hold further that when an insurer has failed to satisfy the statutory criteria of W. Va.Code § 33–6–31(k) (1995) (Repl.Vol.1996) requisite to incorporating an exclusion in a policy of motor vehicle insurance, the enforcement of such an exclusion is violative of this State's public policy. To facilitate the enforcement of this statutory requirement and to ensure that an appropriate premium adjustment does, in fact, accompany an insurer's incorporation of

coverage exclusions, we restate our holding in Syllabus point 7 of *National Mutual Insurance Co. v. McMahon & Sons, Inc.*, which cautioned that "[a]n insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." 177 W.Va. 734, 356 S.E.2d 488 (1987). Applying this holding to our pronouncement herein requiring insurers to adjust policy premiums commensurate with their policy exclusions, the burden borne by insurers in instances similar to the case *sub judice* would include proof that such a premium adjustment has, in fact, taken place.

Looking now to the facts with which we are confronted in the instant appeal, we are unable to locate in the appellate record any evidence that Anthem satisfied its statutory duty by adjusting Ms. Mitchell's policy premium to account for the inclusion of her "owned but not insured" exclusion. If such proof of a premium adjustment was, in fact, proffered to the lower court, the parties had a burden of preserving such evidence for appellate consideration. "The responsibility and burden of designating the record is on the parties, and appellate review must be limited to those issues which appear in the record presented to this Court." Syl. pt. 6, *In re Michael Ray T.*, 206 W.Va. 434, 525 S.E.2d 315 (1999). Absent proof of these facts, we cannot determine whether Anthem properly included the "owned but not insured" exclusion in Ms. Mitchell's policy of insurance.

Neither can we find in the appellate record any indication that the circuit court weighed the limitation of coverage with the corresponding policy premium in awarding Anthem summary judgment and declaratory judgment. As with facts not appearing in the record below, this Court is also limited in its ability to consider, for the first time on appeal, issues which a lower tribunal has not yet deliberated and decided.

" ' "In the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken." Syllabus Point 1, *Mowery v. Hitt*, 155 W.Va. 103[, 181 S.E.2d 334] (1971).' Syl. pt. 1, *Shackleford v. Catlett*, 161 W.Va. 568, 244 S.E.2d 327 (1978)." Syllabus point 3, *Voelker v. Frederick Business Properties Co.*, 195 W.Va. 246, 465 S.E.2d 246 (1995).

Syl. pt. 7, *In re Michael Ray T.*, 206 W.Va. 434, 525 S.E.2d 315. Given the lack of record evidence suggesting that the circuit court contemplated whether Anthem's exclusion correlated to the policy premiums it charged Ms. Mitchell, we cannot rule definitively on the propriety of the circuit court's decision to uphold the exclusion above the statutorily required minimum limits for UM coverage. Accordingly, we vacate the circuit court's order finding the "owned but not insured" exclusion to be valid above the statutory limits of UM coverage, in accordance with our prior holding in Syllabus point 4 of *Imgrund v. Yarborough*, 199 W.Va. 187, 483 S.E.2d 533, and remand this matter for further proceedings consistent with this opinion and pursuant to our instructions delineated below. Upon reconsideration of this matter, we direct the circuit court to base its determination of whether Anthem appropriately adjusted Ms. Mitchell's premium to reflect the "owned but not insured" exclusion contained in her policy, as well as its final decision regarding the exclusion's validity, upon the evidence already contained in the record of this case. In other words, we do not believe that special deference should be accorded to Anthem to permit it to make a new or more detailed record of its alleged premium adjustments when, pursuant to our holding in Syllabus point 7 of *McMahon & Sons* rendered over a decade ago, insurers have long been charged with the burden of proving facts necessary to permit the enforcement of their policy exclusions. *See* Syl. pt. 7, 177 W.Va. 734, 356 S.E.2d 488 ("An insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion.").

Before concluding our discussion herein, we would like to take this opportunity to speak on a matter that has troubled us during our decision of this case. Policies of insurance, including those providing coverage for motor vehicles, are regulated and ap-

proved by this State's Insurance Commissioner [hereinafter "the Commissioner"]. W. Va.Code § 33–6–8 (1994) (Repl.Vol.1996). Inherent in the Commissioner's statutory duty to oversee policy provisions is his/her corresponding obligation to reject those policies that do not comply with West Virginia insurance law. Specifically, W. Va.Code § 33–6–9 (1957) (Repl.Vol.1996) directs that

[t]he commissioner shall disapprove any such form of policy, application, rider, or endorsement or withdraw any previous approval thereof:

(a) *If it is in any respect in violation of or does not comply with this chapter.*

(b) *If it contains or incorporates by reference any inconsistent, ambiguous, or misleading clauses, or exceptions and conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract.*

(c) *If it has any* title, heading, or *other indication of its provisions which is misleading.*

(d) If the purchase of such policy is being solicited by deceptive advertising.

(e) *If the benefits provided therein are unreasonable in relation to the premium charged.*

(f) If the coverages provided therein are not sufficiently broad to be in the public interest.

(Emphasis added). Thus, it is apparent that the Legislature has vested the Commissioner with sufficient authority to reject policy provisions which do not clearly and accurately inform the insured as to the coverage provided by such policy.

█ Despite the Commissioner's regulatory powers, we are mindful, from the policy language at issue in this case, that two marginally viable practices continue to accompany the incorporation of insurance policy ex-

clusions. First, we observe that the "owned but not insured" exclusion in this case, though it was clearly designated as a limitation of the available UM coverage, most likely would not have been apparent to the majority of insurance consumers given its less-than-prominent placement in the appropriate policy endorsement. We previously have counseled insurance companies that

[a]n insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured.

Syl. pt. 10, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488. Therefore, we urge the Commissioner to review proffered policies of insurance to ensure that coverage exclusions are not so incognito as to be deceptive or misleading as to the true scope of coverage available to the insured. *See* W. Va.Code § 33–6–9.[24]

█ Second, the Commissioner is obligated to uphold the law of this State and to reject any policy, endorsement, and the like "[i]f it is in any respect in violation of or does not comply with this chapter." W. Va.Code § 33–6–9(a). In this regard, we note that the language of Anthem's "owned but not insured" exclusion does not suggest, in any manner, that an insured is entitled to recover a statutory minimum amount of UM insurance benefits. Our prior decision in *Imgrund* clarified this entitlement vis-a-vis "owned but not insured" exclusions, and we recognize that strict application of the *Imgrund* requirements to this case would result in an improper retroactive application of the law.[25] *See* Syl. pt. 4, *King v. Kayak Mfg.*

24. Methods by which insurers may effectively communicate an exclusion to an insured to secure his/her awareness thereof may include, but are not necessarily limited to, reference to the exclusion and corresponding premium adjustment on the policy's declarations page or procurement of the insured's signature on a separate waiver signifying that he/she has read and understood the coverage limitation. *See, e.g.,* Syl. pt. 1, *Bias v. Nationwide Mut. Ins. Co.*, 179 W.Va.

125, 365 S.E.2d 789 (1987) (directing insurer to obtain insured's knowing and informed rejection of optional coverage when the offer thereof is statutorily required).

25. The automobile accident underlying the instant appeal, which occurred in 1996, predates our decision in *Imgrund*, which was issued in 1997.

*Corp.,* 182 W.Va. 276, 387 S.E.2d 511 (1989) (discussing factors to consider regarding retroactivity); Syl. pt. 5, *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979) (same). Nevertheless, our statutory law mandating such coverage was in effect long before the events at issue herein, thereby placing insurers on notice as to required coverage provisions. *See, e.g.,* W. Va. Code § 33–6–31(b) (1972) (Repl.Vol.1972). Thus, it appears to this Court that, regardless of any curative measures incorporated in the terms of the policy, *e.g.,* a severability clause,[26] or by statute, *e.g.,* W. Va.Code § 33–6–17 (1957) (Repl.Vol.1996),[27] an insured could very likely understand an exclusion, which does not reference his/her statutory entitlement to minimum UM benefits, as completely precluding any recovery of UM benefits thereunder. Accordingly, we caution the Commissioner to be ever watchful for exclusionary language that could prevent an insured from appreciating the true measure of coverage afforded by his/her policy of insurance.

In conclusion, we charge the West Virginia Insurance Commissioner to be ever vigilant in safeguarding the rights of insurance consumers in this State while upholding the law permitting insurers to incorporate exclusions to coverage.

## IV.

## CONCLUSION

For the foregoing reasons, the April 15, 1998, order of the Circuit Court of Raleigh County is hereby vacated, and this matter is hereby remanded to that court for further proceedings consistent with this opinion.

Vacated and Remanded.

**26.** Such a clause operates in a contract to "render[ ] enforceable a valid part, it availing pro tanto, although another part may be invalid." Ballentine's Law Dictionary 1168 (3d ed.1969) (citation omitted).

**27.** W. Va.Code § 33–6–17 (1957) (Repl.Vol.1996) states that

[a]ny insurance policy, rider, or endorsement hereafter issued and otherwise valid

STARCHER, Justice, concurring.

(Filed April 21, 2000)

I concur with the majority's analysis of our uninsured motorist insurance statute. I agree that the statute requires an insurance carrier to demonstrate that it has "appropriately adjusted" the premiums for an automobile insurance policy (which ostensibly provides comprehensive coverage) to reflect that the coverage has in fact been reduced or eliminated through an exclusion buried in the policy. Our insurance laws plainly require insurance companies to ensure that any exclusion written into an automobile insurance policy be "consistent with the premium charged," and to also tell the consumer in plain language when an "exception or condition" in any type of insurance policy limits the general coverage which the consumer assumes they are purchasing.

This case is another example of the axiom that "what the big print giveth, the small print taketh away." As former Justice Neely eloquently stated, "In most insurance cases, the plaintiffs pay for and believe they have insurance, to discover only after disaster strikes, no insurance. The insurer has the plaintiffs' money and after the disaster—fire, death or accident—informs the plaintiffs that no insurance covers the fire, death or accident." *Keller v. First National Bank,* 184 W.Va. 681, 684, 403 S.E.2d 424, 427 (1991).

The problem in most insurance cases lies in the fact that, unlike most consumer purchases, what consumers believe they are buying is not the product that the insurance company actually sells and delivers. The insurance company markets its product through brochures and advertisements that assure the consumer they will be in "good hands." The insurance consumer buys the

which contains any condition or provision not in compliance with the requirements of this chapter, shall not be thereby rendered invalid but shall be construed and applied in accordance with such conditions and provisions as would have applied had such policy, rider, or endorsement been in full compliance with this chapter.

product believing they are buying peace of mind, and the assurance that if bad things happen to their house, car or themselves, they will be taken care of. However, what the insurance company is really selling is the promise to pay only a limited amount of dollars if specific bad things happen. The consumer never discovers how limited the insurance company's promises are until after they have paid the premiums and a loss has occurred.

I firmly believe that insurance companies can define the risks they are insuring against by using exclusions and conditions in insurance policies. However, I also believe, as the majority opinion recognizes, that insurance companies have an affirmative duty to advise consumers of the existence of such limiting exclusions and conditions in a policy, and to advise consumers—before litigation occurs—that the company has adjusted the premiums so that the policy reflects the reduction or elimination of coverage caused by an exclusion.

The majority's focus in this case was on the fundamental unfairness of the Anthem "owned but not insured" exclusion. The record from the circuit court contains little evidence of the circumstances surrounding Mary Mitchell's purchase of insurance from Anthem, and little evidence of how Anthem communicated the exclusion to Mary Mitchell. There is absolutely no evidence in the appellate record regarding whether Anthem reduced its premiums to reflect the exclusion, and if so, whether that reduction was communicated to Mary Mitchell.

As best I can tell from the record, Mary Mitchell never asked for the exclusion, never bargained for the exclusion, and never knew it existed until after she (and later her estate) sought coverage. Mary Mitchell bought $300,000 in coverage. Anthem refused to pay anything at all. Only after

months of litigation did Anthem even agree to pay a mere $20,000 in coverage.

The briefs of the attorneys for the parties inadequately discussed the statutes, case law, and public policy surrounding how we should interpret *W.Va.Code*, 33–6–31(b), our lengthy uninsured motorist statute. This occurred even though we specifically ordered the parties to brief these issues. Hence, the majority's opinion focused solely on correcting the unfair situation created by Anthem's "owned-but-not-insured" exclusion. There was no attempt to explain how the rules adopted in the majority opinion are to apply to future cases.

I write separately to emphasize the impact that the majority's opinion will have on the future handling of insurance claims in West Virginia. Surprising a policyholder, after a fire, death or accident, with an exclusion that no rational, honest person would expect to find in a comprehensive insurance policy is fundamentally unfair. The majority's opinion crafts a framework for how an insurance company bears the burden of eliminating that policyholder surprise by (1) telling the policyholder, up front, before they make a claim, that their policy contains exclusions and that "there is no coverage for this, this, and that;" and (2) telling the policyholder how much it has reduced their premiums because of the exclusions.[1]

I write to fill in the framework built in the majority's opinion.

In simple terms, the Court's decision is based on the premise that consumers do not read (and even if they do read, cannot understand) the terms that insurance companies use in insurance policies. Insurance companies give consumers the impression that they have full coverage under a comprehensive policy, and routinely fail to tell the consumer in plain English of the existence and the meaning of the legalistic exclusions that the insurance company has buried in a policy. So, when an insurance company seeks to

---

1. As the majority opinion makes clear, an insurance company has a statutory duty to advise the holder of a *motor vehicle* insurance policy that their premiums have been adjusted to reflect an exclusion, condition or other limitation in the policy. *See* footnote 24 of the majority's opinion.

However, I find no limitation in the *West Virginia Code* or our jurisprudence that prohibits the application of this principle to all other types of insurance policies.

avoid liability on an automobile insurance policy through the use of an exclusion, courts should first determine whether the insurance company created a reasonable expectation of coverage in the consumer, and whether the insurance company eliminated that expectation by telling the policyholder (1) that their coverage has been reduced or eliminated by the exclusion, and (2) that their premiums have been reduced to reflect the exclusion.

### A.

### Consumers neither Read nor Understand Insurance Policies

A fundamental precept of our insurance statutes and our case law is the recognized fact that insurance consumers do not, repeat, DO NOT, read insurance policies.

In the average, non-insurance contract case, courts will not excuse a party's failure to read the contract. Nevertheless, insurance contracts are treated differently by courts, in part because they are not freely negotiated agreements between the insurance carrier and the policyholder. Also, the policyholder's decision to purchase insurance is often not entirely voluntary. For example, West Virginia law requires vehicle owners to purchase liability and uninsured motorist coverage, and banks require people who borrow money to buy property insurance to insure their new home or comprehensive and collision coverage to insure their new car.

Furthermore, a policyholder buys a policy as a completed "product," a standardized "fill-in-the-blanks" contract form that is essential to our system of mass production and distribution. By using these standardized forms, an insurance company simplifies the insurance purchasing process, and thereby reduces the overall costs of insurance. Consumers who buy a standard form insurance policy know that they cannot have the product changed or customized, and must take what they are given.[2] Hence, both the insur-

ance agent and the policyholder know that it would be pointless for the policyholder to scrutinize the specific language and terms of the policy. The drafters of the *Restatement of Contracts (Second)*, in their discussions regarding contracts of adhesion like an insurance policy, recognized that:

> A party who makes regular use of a standardized form of agreement does not ordinarily expect his customers to understand or even to read the standard terms. One of the purposes of standardization is to eliminate bargaining over details of individual transactions, and that purpose would not be served if a substantial number of customers retained counsel and reviewed the standard terms. Employees regularly using a form often have only a limited understanding of its terms and limited authority to vary them. Customers do not in fact ordinarily understand or even read the standard terms. They trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated. *But they understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose.*

*Restatement of Contracts (Second)*, § 211, comment b [1981] (emphasis added).

In sum, how insurance companies sell insurance policies dictates how those policies will be interpreted by the courts.

> "[O]nly by acknowledging that the conditions of an insurance contract are for the most part dictated by the insurance companies and that the insured cannot 'bargain' over anything more than the monetary amount of coverage purchased, does our analysis approach the realities of an insurance transaction."

*Collister v. Nationwide Life Ins. Co.*, 479 Pa.

---

2. One commentator aptly noted:
 [I]n the current era of mass marketing, a party may reasonably believe that he is not expected to read a standardized document and would be met with impatience if he did. In such circumstances an imputation that he assents to all of the terms in the document is dubious law.

An assertion that he is bound by them would place a premium upon an artful draftsman who is able to put asunder what the salesman and the customer have joined together.
J. Calamari, "Duty to Read: A Changing Concept," 43 *Fordham L.Rev.* 341 (1974).

579, 593, 388 A.2d 1346, 1353 (1978).[3] Because of the way insurance policies are sold, courts interpreting those policies *will and do* excuse a policyholder's failure to read the policy.

Another corollary problem with interpreting insurance contracts is the knowledge of the parties to the contract. An insurance company drafts insurance policy language in light of the statutes of dozens of different states, and in light of the varying interpretations by courts of the statutes and policy language. Policy language is also drafted to reflect the types of claims that are filed by policyholders. The policyholder lacks such knowledge, and therefore lacks an understanding of the factual and legal context into which the insurance company designs a policy provision to fit.[4]

Another important consideration is that most insurance consumers do not even see—repeat, DO NOT EVEN SEE—the policy that they purchased until after they have paid the premiums.[5] It is therefore unfair to

3. Another court similarly stated:

 Insurance policies are unipartite in nature. They are prepared by the company's experts, men learned in the law of insurance who serve its interests in exercising their art of draftsmanship. The resulting document with its many clauses is given to the insured upon the payment of the premium. There is no arm's length bargaining such as characterizes negotiations between equals in the marketplace. Consequently courts in their quest for justice for the insured, universally give him the benefit of any construction of the language which can be said fairly to represent the protection extended to him.

 *Bowler v. Fidelity Casualty Co. of New York*, 53 N.J. 313, 326, 250 A.2d 580, 587 (1969).

 Professor Keeton, in his seminal law review article discussing the doctrine of reasonable expectations, also discussed the need for judicial protection of policyholders that is caused by the one-sided nature of insurance policies:

 Insurance contracts continue to be contracts of adhesion, under which the insured is left little choice beyond electing among standardized provisions offered to him, even when the standard forms are prescribed by public officials rather than insurers. Moreover, although statutory and administrative regulations have made increasing inroads on the insurer's autonomy by prescribing some kinds of provisions and proscribing others, most insurance policy provisions are still drafted by insurers. Regulation is relatively weak in most instances, and even the provisions prescribed or approved by legislative or administrative action ordinarily are in essence adoptions, outright or slightly modified, of proposals made by insurers' draftsman.

 R. Keeton, "Insurance Law Rights at Variance with Policy Provisions," 83 *Harv.L.Rev.* 961 (1970).

4. For example, Mary Mitchell could not have understood that West Virginia's insurance code mandated she receive $20,000 in uninsured motorist coverage—coverage that would protect her wherever she might be—but that the remaining $280,000 in coverage could be argued to be limited to only specific circumstances in light of this Court's interpretation of a different portion of the insurance code in *Deel v. Sweeney*, 181 W.Va. 460, 383 S.E.2d 92 (1989). Mary Mitchell's confusion would be further compounded if she knew that in *Bell v. State Farm Mutual Automobile Ins. Co.*, 157 W.Va. 623, 207 S.E.2d 147 (1974), this Court totally invalidated "owned but not insured" exclusions like that employed by Anthem, and yet over 20 years later Anthem was using language in its policy that totally voided *any* coverage, without regard to *Bell* or the statutes mandating $20,000 in coverage.

 This is all hypothetical, of course. The point is, insurance companies have teams of lawyers who read statutes and cases, and deal with sticky legal questions created by insurance policies day after day. Insurance companies apply insurance policy provisions to numerous legal and factual situations every day. Policyholders, on the other hand, make claims against their policy on, at most, only a handful of occasions in a lifetime.

5. Imagine buying a new car. We know we can dicker with the salesman over the color of the car, whether it has two or four doors, the kind of radio—we are given a list of choices, and pick from the list. However, no one would think to demand that the car manufacturer build the car 6 inches longer and add reinforcing steel to the sides for greater safety—its just not an option. In the age of mass production, we take the choices we are given. Insurance consumers, however, have few choices beyond the level of coverage and the premium they are willing to pay.

 Now, imagine going to a car dealership to buy a new car. The car salesman gives you three options of colors, and says "pick." The price you pay for the car will depend on the color you pick. And you don't get to actually see the car until several weeks *after* you buy the car. You pay the dealer some money, and 4 weeks later the dealer delivers it to your house. And when you discover after you put the key in the ignition that the car doesn't have an engine, the dealer pulls the owner's manual out of the glove box, points to the phrase "engine not included," and insists that you knew all along the car came without an engine because the phrase "engine not included" is in the owner's manual. The dealer will also insist that your failure to read the

bind a consumer by the terms of an exclusion that the insurance carrier never showed to the consumer at the time the consumer purchased the policy.[6]

### B.

### Reasonable Expectations of the Policyholder

Professor Keeton, in his seminal article on the interpretation of insurance contracts, says that courts routinely, implicitly acknowledge that insurance policies are contracts of adhesion, and that insurance consumers do not read, and if they did would not understand, insurance policies. In response to this acknowledged problem, courts often act to prohibit insurance companies from having any unfair or unconscionable advantage in insurance transactions. Additionally, courts interpret insurance contracts in a way that will honor the reasonable expectations of policyholders and beneficiaries, regardless of the details of the policy language. R. Keeton, "Insurance Law Rights at Variance with Policy Provisions," 83 *Harv.L.Rev.* 961 [1970]. Professor Keeton suggests that courts have used a number of strategies to achieve these goals, including finding policy language to be ambiguous, or invoking contractual theories of detrimental reliance or unconscionability.

When a policy is read by a court against an insurance company in a manner that is at variance with the technical language of the insurance policy, observers often shrug, explaining the court's decision with "the ambi-

valent, suggestive, and wholly unsatisfactory aphorism: 'It's an insurance case.'' *Id.*

To give meaning to decades of conflicting court decisions, Professor Keeton distilled a fundamental principle that underlies most insurance cases, and "that insurance law ought to [openly] embrace." 83 *Harv.L.Rev.* at 967. The principle he distilled is this:

The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

*Id.*

Seventeen years later, this Court followed Professor Keeton's suggestion and embraced this legal principle. In Syllabus Point 8 of *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987), we held that:

With respect to insurance contracts, the doctrine of reasonable expectations is that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

Our Legislature has established by law a similar rule as the public policy of this State. Our insurance laws state that an insurance carrier may not issue an insurance policy which contains "exceptions or conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract." *W.Va.Code*, 33–6–9(b) [1957].[7] In

---

owner's manual, and therefore your ignorance of this contractual provision, is your own fault.

The analogy sounds absurd, but it is exactly what insurance companies do in the transaction of insurance.

**6.** For a list of cases discussing the fact that "most consumers never even see the policy until after the premiums are paid," *see Kelly v. Painter*, 202 W.Va. 344, 350 n. 2, 504 S.E.2d 171, 177 n. 2 (1998) (Starcher, J., concurring).

**7.** The majority opinion exhorts the Insurance Commissioner to enforce this statute and be "ever vigilant in safeguarding the rights of insurance consumers in this State[.]" While I agree with this statement, I recognize that the Commissioner and his staff may give short shrift to this

statutory duty due to budgetary and other constraints.

Here is how it happens: *W.Va.Code*, 33–6–8 [1994] requires an insurance carrier to file copies of any insurance policy, endorsement, rider or other type of form that is part of a policy with the Insurance Commissioner at least 60 days before delivering such a document to an insurance consumer. The Insurance Commissioner, in theory, must then examine and either approve or reject the document.

The catch to this process is found in *W.Va. Code*, 33–6–8(b), which states in pertinent part:

At the expiration of such sixty days, the form so filed shall be deemed approved unless prior thereto it has been affirmatively approved or disapproved by the commissioner.

sum, before an insurance carrier may rely on an exclusion to avoid liability on an insurance contract, it must demonstrate that the "exceptions or conditions" were not deceptive, and were communicated to the insured in a manner calculated to advise the insured of the adverse effect that the exclusionary language would have on the general insurance coverage provided by the policy.

An insurance company's statutory responsibility to fully convey to a policyholder the effect that an exception or condition will have upon the risk purported to be assumed by the general coverage of the policy is parallel to its obligation of fulfilling the reasonable expectations it has created in its policyholders.

"The rule of reasonable expectations applies if there is a dispute as to the existence of insurance coverage." *Tynan's Nissan, Inc. v. American Hardware Mut. Ins. Co.*, 917 P.2d 321 (Colo.Ct.App.1995). The doctrine exists to insure that the insurance consumer's reasonable expectations are fulfilled—every consumer has a right to expect they will receive something of comparable value in return for the premiums they have paid.

A contract to provide insurance should be interpreted and applied as a layman would understand the contract, based upon the entire insurance purchasing transaction, and not according to an after-the-fact interpretation given by sophisticated underwriters and lawyers. The expectations of the average consumer should be enforced *regardless of any ambiguity in the policy language.*[8]

In other words, if the Insurance Commissioner does nothing and lets the insurance documents collect dust on a corner of his or her desk for 60 days, the documents are automatically deemed to be "approved" as valid under West Virginia law.

Because of this administrative loophole, courts allow citizens to fill this regulatory void through actions to enforce the reasonable expectations of coverage created by insurance carriers. *W.Va. Code*, 55-7-9 [1923] authorizes such an action and states:

Any person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages.

As discussed in the text, a policyholder may therefore seek to have a policy declared as void when the insurance policy contains "inconsistent, ambiguous, or misleading clauses, or exceptions and conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract." *W.Va.Code*, 33-6-9(b) [1957].

8. As the majority opinion implies, the doctrine of reasonable expectations as applied in *National Mut. Ins. Co. v. McMahon & Sons, Inc., supra* does *not* require that the specific language of an insurance policy be ambiguous. Rather, the focus is whether ambiguity exists in the entire insurance transaction—could a reasonable policyholder under similar circumstances believe coverage exists when the insurance company asserts that it does not?

The concept of construing the specific language of an insurance policy which is ambiguous in accord with the reasonable expectations of a policyholder and against the insurance company is a principle of contract law, not insurance law. The drafter of a contract, particularly an adhesion contract, has a duty of choosing language carefully. Any ambiguous language is strictly construed against the preparer of a contract so long as the construction chosen by the nondrafter is reasonable. *See, e.g., Nisbet v. Watson*, 162 W.Va. 522, 530, 251 S.E.2d 774, 780 (1979).

However, the insurance doctrine of reasonable expectations operates independently of any ambiguity in the language of the insurance policy. This Court has incorrectly suggested that language ambiguity is a requirement. *See National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. at 742, 356 S.E.2d at 496 (1987) ("In West Virginia, the doctrine of reasonable expectations is limited to those instances ... in which the policy language is ambiguous.") (*Citing Soliva v. Shand, Morahan & Co.*, 176 W.Va. 430, 433, 345 S.E.2d 33, 36 (1986)); Syllabus Point 2, *Robertson v. Fowler*, 197 W.Va. 116, 475 S.E.2d 116 (1996). ("Before the doctrine of reasonable expectations is applicable to an insurance contract, there must be an ambiguity regarding the terms of that contract.")

The "terms" of an insurance policy are the mutual undertakings of the parties to the agreement, while the "language" of a policy are the specific words and grammar chosen to express those terms. An insurance policy is construed when the language is ambiguous, and applied when the language is not ambiguous. The doctrine of reasonable expectations applies when the terms of the insurance transaction are ambiguous—namely, when the policyholder and insurance company disagree about who was going to do what. When the insurance company makes broad representations of coverage to the policyholder, and at the same time in the un-read fine print the coverage is limited, there is an ambiguity in the terms of the contract, regardless of the clarity of the specific fine-print exclusion language. If a disagreement exists as to the terms of the agreement, then the reasonable expecta-

When the actions of the insurance company and its agents (through their advertisements, brochures, statements, applications, policies, conditional receipts, or whatever) give a consumer a reasonable expectation that insurance coverage for an event has been purchased, then courts should enforce that reasonable expectation, regardless of the policy language.

> Courts should also keep alert to the fact that the expectations of the insured are in large measure created by the insurance industry itself. Through the use of lengthy, complex, and cumbersomely written applications, conditional receipts, riders, and policies, to name just a few, the insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent. Such representations may or may not accurately reflect the contents of the written document and therefore the insurer is often in a position to reap the benefit of the insured's lack of understanding of the transaction..... Courts must examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer.

*Collister v. Nationwide Life Ins. Co.*, 479 Pa. 579, 594–95, 388 A.2d 1346, 1353–54 (1978)

tions of the policyholder should be enforced, regardless of what a painstaking reading of the policy language might reveal.

Professor Keeton makes clear why language ambiguity is not necessary to the operation of the doctrine of reasonable expectations:

> [I]nsurers ought not to be allowed to use qualifications and exceptions from coverage that are inconsistent with the reasonable expectations of a policyholder having an ordinary degree of familiarity with the type of coverage involved. This ought not to be allowed even though the insurer's form is very explicit and unambiguous, because insurers know that ordinarily policyholders will not in fact read their policies.... Moreover, the normal processes for marketing most kinds of insurance do not ordinarily place the detailed policy terms in the hands of the policyholder until the contract has already been made.... Thus, not only should a policyholder's reasonable expectations be honored in the face of difficult and technical language, but those expectations should prevail as well when the language of an unusual provision is clearly understanda-

Thus, in a situation in which the public may reasonably expect coverage, an exclusion must be conspicuous, plain and clear. Ninety years ago one court recognized that insurance consumers do not read policies and exclusions, and usually could not understand their implications if they did. That court suggested that as a solution, before a policy exclusion would be enforced, the insurance company would be required to bring the provision to the attention of the insurance consumer. The court stated, when discussing whether to enforce an exclusion:

> It is a matter almost of common knowledge that a very small percentage of policy holders are actually cognizant of the provisions of their policies and many of them are ignorant of the names of the companies issuing the said policies. The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous—the one before us covering thirteen pages of the transcript—and in their numerous conditions and stipulations furnishing what sometimes may be veritable traps for the unwary. The insured usually confides implicitly in the agent securing the insurance, and it is only just and equitable that the company should be required to call specifically to the attention of the poli-

ble, unless the insurer can show that the policyholder's failure to read such language was unreasonable.

> \* \* \* \* \* \*

> Moreover, the principle of resolving ambiguities against the draftsman is simply an inadequate explanation of the results of some cases. The conclusion is inescapable that courts have sometimes invented ambiguity where none existed, then resolved the invented ambiguity contrary to the plainly expressed terms of the contract document. To extend the principle of resolving ambiguities against the draftsman in this fictional way not only causes confusion and uncertainty about the effective scope of judicial regulation of contract terms but also creates an impression of unprincipled judicial prejudice against insurers.

83 *Harv.L.Rev.* at 968, 972.

Any reading of *McMahon & Sons* or *Robertson v. Fowler* as suggesting a requirement of specific language ambiguity before the reasonable expectations of a policyholder may be enforced is, therefore, simply wrong.

cy holder such provisions as the one before us.

*Raulet v. Northwestern National Ins. Co. of Milwaukee,* 157 Cal. 213, 230, 107 P. 292, 298 (1910).

When an exclusion is not brought to the attention of a policyholder, it would be unjust to apply the unknown provision to void the coverage which the policyholder fully and justifiably expects to be provided by the policy. As another California appeals court stated, nearly 30 years ago:

> It is now firmly settled that insurance contracts are contracts of adhesion between parties not equally situated. Consequently, the insurer, as the dominant and expert party in the field, must not only draft such contracts in unambiguous terms but must bring to the attention of the insured all provisions and conditions which create exceptions or limitations on the coverage.

*Young v. Metropolitan Life Ins. Co.,* 272 Cal.App.2d 453, 460–61, 77 Cal.Rptr. 382, 387 (1969). Another court suggested that "verbal vacuity" could not "serve as clear and plain notice to the insured of noncoverage." *Steven v. Fidelity and Casualty Co. of New York,* 58 Cal.2d 862, 872, 27 Cal.Rptr. 172, 178, 377 P.2d 284, 290 (1962). From these precedents, a later court gleaned a general principle of public policy:

> In the case of standardized insurance contracts, exceptions and limitations on coverage that the insured could reasonably expect, must be called to his attention, clearly and plainly, before the exclusions will be interpreted to relieve the insurer of liability or performance.

*Logan v. John Hancock Mut. Life Ins. Co.,* 41 Cal.App.3d 988, 995, 116 Cal.Rptr. 528, 532 (1974).

9. Many courts have, as part of the doctrine of reasonable expectations, placed a duty on insurance carriers to explicitly inform policyholders of the existence of exclusions. The courts of Colorado have applied the following rule:

> [A]n insurer who wishes to avoid liability must do so in clear and unequivocal language and must call such limiting conditions to the attention of the insured. Absent such disclosure, coverage will be deemed to be that which could be expected by the ordinary lay person.

As the majority opinion states, an insurance carrier bears the burden of dispelling a policyholder's reasonable expectations. The insurance company must prove that a policyholder has been affirmatively apprised of all exclusions in a policy that limit any "general coverage" that a policyholder has purchased and reasonably expects will exist to indemnify against a particular loss. We discussed this duty of an insurance carrier in *National Mut. Ins. Co. v. McMahon & Sons, Inc., supra,* where we stated at Syllabus Point 10 that "An insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage ... must bring such [exclusionary] provisions to the attention of the insured."

The doctrine of reasonable expectations thus limits an insurance carrier's use of exclusions in one portion of a policy to eliminate a broad grant of coverage in another portion of the policy. In other words, an insurance company may not give with the big print and take away with the small print, when the big print reasonably gave the purchaser of the policy an expectation of coverage. An insurance company has an affirmative duty to inform an insurance consumer what they are purchasing; it is not the duty of the consumer to seek out exclusions, limitations and conditions which are not plainly revealed to him or her.

If an insurance company wishes to avoid liability on an insurance policy through the operation of an exclusion or other policy condition, it must do so in clear and unequivocal language. Furthermore, the insurance company must call such limiting conditions to the attention of the insured, and explain the effect of the condition. Absent such a disclosure, the policy coverage will be deemed to be that which could be expected by the ordinary lay person.[9]

*Tynan's Nissan, Inc. v. American Hardware Mut. Ins. Co.,* 917 P.2d 321, 324 (Colo.App.1995). *See also, Peters v. Boulder Insurance Agency, Inc.,* 829 P.2d 429 (Colo.App.1991); *Leland v. Travelers Indemnity Co.,* 712 P.2d 1060 (Colo.App.1985).

Louisiana has a very simple rule: "Insurance policy exclusions are not valid unless clearly communicated to the insured." *Sims v. Insurance Unlimited of West Monroe,* 669 So.2d 709, 711 (La.App.1996). "Notice of any exclusionary provisions is essential because the insured will

## C.

### Conclusion

On remand, the circuit court should consider whether Mary Mitchell had a reasonable expectation of uninsured motorist coverage. Additionally, the circuit court should determine whether Anthem brought the "owned but not insured" exclusion to Mrs. Mitchell's attention, and told her the premiums for the policy had been reduced along with her coverage.

I see nothing in the existing record to suggest that Anthem directed Mary Mitchell's attention to the exclusion they assert is controlling in her insurance policy. "The law expects an insurance salesman to tell an insurance consumer that an insurance product does not do what the consumer would expect it to do." *Kelly v. Painter*, 202 W.Va. 344, 349, 504 S.E.2d 171, 176 (1998) (Starcher, J., concurring).

Mary Mitchell bought $300,000 of insurance to protect her against uninsured motorists like Anthony Broadnax. Anthem should not be permitted to surprise Mary Mitchell with an exclusion of which she was not aware and for which she did not bargain. If Anthem never told her of the exclusion, and never explained its effect, and never told her

otherwise assume the desired coverage exists." *Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1252 (1993).

Idaho has also stated its rule in simple terms: "It is the duty of the insurer to inform the insured of what he is obtaining; it is not the duty of the insured to seek out exclusions and limitations not revealed to him." *Featherston v. Allstate Ins. Co.*, 125 Idaho 840, 843, 875 P.2d 937, 940 (1994).

*See also, Barrette v. Casualty Co. of America*, 79 N.H. 59, 60, 104 A. 126, 127 (1918) ("[T]he company did absolutely nothing to notify [policyholder] Dubray [of the exclusion] ... [W]hen the company's local agent delivered the policy, he gave Dubray to understand that it protected him from all liability ... It cannot be said that Dubray was in fault for relying on the agent's representation, or that the ordinary man in his situation would have read the policy to ascertain whether it evidenced the contract he made with the company[.]"); *General Motors Acceptance Corp. v. Martinez*, 668 P.2d 498, 501 (Utah 1983) ("Utah appellate courts have consistently held that exclusions from coverage under an insurance policy, even if clear, are ineffective unless

it cut her premiums by a few dollars to account for the exclusion, then Anthem should not be allowed, after-the-fact, to try to rely on the exclusion to avoid its responsibilities under the policy.[10]

The result reached by the circuit court, in enforcing the exclusion, was patently unfair.

I therefore concur.

McGRAW, Justice, concurring in part, and dissenting in part.

(Filed Oct. 20, 2000)

While I agree that the circuit court's award of summary judgment must be reversed in this case, I do so without joining the majority in embracing the logic of *Imgrund v. Yarborough*, 199 W.Va. 187, 483 S.E.2d 533 (1997), or its precursor, *Deel v. Sweeney*, 181 W.Va. 460, 383 S.E.2d 92 (1989). Although both of these cases work from the premise that policy exclusions must not conflict with the "spirit and intent" of the uninsured and underinsured motorist statutes, *Deel*, 181 W.Va. at 463, 383 S.E.2d at 95, neither appears to recognize that the "owned-but-not-insured" exclusion is, in fact, wholly at odds with the basic requirements of W. Va.Code § 33–6–31(b) & (c). The statute not only places a duty upon automobile insur-

they are communicated to the insured in writing."); *Moore v. Energy Mutual Ins. Co.*, 814 P.2d 1141, 1143 (Utah Ct.App.1991) ("[E]xclusions from coverage must use 'language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided.'")

10. The only evidence I can find in the record regarding Mary Mitchell's interaction with an insurance agent consists of the policy and the application. The application completed by Mary Mitchell in 1992 states that she was, at that time, a 74–year–old housewife seeking coverage on her 1981 Buick. She purchased liability coverage of $300,000 per person, per occurrence; $300,000 in property damage coverage; and $300,000 in bodily injury coverage per person, per occurrence, and for property damage caused by an uninsured and underinsured motorist. She also bought towing and rental insurance.

The application shows that Mary Mitchell had been insured through the same insurance agency for 21 years (since May 1971) and that the agent recommended she be approved for the Anthem policy because she was an "excellent insurance client."

ers to provide and/or offer their customers uninsured and underinsured motorist coverages in amounts equal to or greater than the minimums set forth in W. Va.Code § 17D–4–2, but also requires that such coverages be "person-oriented," in that members of the policyholder's household must be afforded coverage irrespective of whether they travel in an insured vehicle. As this Court long ago recognized in *Bell v. State Farm Mut. Auto. Ins. Co.*, 157 W.Va. 623, 207 S.E.2d 147 (1974), the owned-but-not-insured exclusion strikes at the very heart of the latter requirement.

In *Bell*, the Court held that the owned-but-not-insured exclusion was void as against public policy because it conflicted with the requirements of § 33–6–31(b) & (c). Specifically, the *Bell* Court looked at both language from subsection (b), requiring that all automobile insurance policies must contain "provisions undertaking to pay *the insured* all sums which he shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle," (emphasis added), and the corresponding definition of an "insured" contained in subsection (c), then defined to mean "the named insured and, while resident of the same household, the spouse of any such named insured, and relatives of either, while in a motor vehicle or otherwise." The Court noted that the statute makes "no distinctions with regard to an owned but not insured motor vehicle, as the coverage applies to use or occupancy of '*a*

*motor vehicle or otherwise,*'" *Bell*, 157 W.Va. at 627, 207 S.E.2d at 149–50 (emphasis in original), and went on to hold that "because the [owned-but-not-insured] exclusionary clause[ ][is] more restrictive than the uninsured motorist statute or add[s] requirements not authorized by the uninsured motorist statute, [it is] repugnant to the statute and therefore void," *id* . at 627, 207 S.E.2d at 150.

At the core of *Bell* is a comprehension that the statute's use of the phrase "while in a motor vehicle or otherwise" requires that uninsured motorist coverage attach to persons, not to particular insured vehicles.[1] Significantly, following the Court's decision in *Bell*, the Legislature amended subsection (c) to provide that an "insured" would further be defined to encompass "any person … who uses, with the consent, expressed or implied, of the named insured, the motor vehicle to which the policy applies." 1979 W.Va. Acts ch. 61. Rather than repudiating *Bell's* interpretation of subsection (c) as necessitating "person-oriented" coverage, the Legislature in fact embraced this distinction, since the amendment tethered coverage for non-householders to use of the insured vehicle.

Notably, *Bell* is in accord with decisions from other jurisdictions, which have held that similar statutory language, focused as it is upon securing uninsured motorist coverage for the "insured" rather than a particular insured vehicle, makes such coverage "person oriented" and not "vehicle oriented."[2]

---

1. The dissent in *Bell* highlighted this distinction, stating that "[t]he term 'motor vehicle' refers to an insured vehicle. Therefore, the holding that a particular policyholder's non-listed vehicle is covered must be derived from the phrase 'or otherwise.'" *Bell*, 157 W.Va. at 630, 207 S.E.2d at 151 (Sprouse, J., dissenting).

2. *See, e.g., Martin v. Midwestern Group Ins. Co.*, 70 Ohio St.3d 478, 639 N.E.2d 438 (1994) ("other owned vehicle" exclusion was unenforceable; uninsured motorist statute mandates coverage to protect persons, not vehicles); *Monteith v. Jefferson Ins. Co. of New York*, 159 Vt. 378, 618 A.2d 488 (1992) ("the essence of UM/UIM coverage under § 941 is its portability. The statute does not allow insurers to condition coverage on the location of the insured nor the insured's status as a motorist, a passenger in a private or public vehicle, or as a pedestrian."); *Farmers Ins. Co., Inc. v. Gilbert*, 14 Kan.App.2d 395, 791 P.2d 742, *aff'd* 247 Kan. 589, 802 P.2d 556 (1990) (unin-

sured motorist coverage protects a named insured "no matter where the named insured may be at the time of injury"); *Chaffin v. Kentucky Farm Bureau Ins. Co.*, 789 S.W.2d 754 (Ky.1990) (uninsured motorist coverage is mandated by statute and has a "personal nature;" coverage cannot be made illusory by exclusions, so exclusion is contrary to public policy and void); *Calvert v. Farmers Ins. Co. of Arizona*, 144 Ariz. 291, 697 P.2d 684 (1985) (relying on a "majority" of 26 jurisdictions that rejected "other vehicle" exclusions, court concluded that uninsured motorist statute established public policy "that every insured is entitled to recover damages he or she would have been able to recover if the uninsured had maintained a policy of liability insurance in a solvent company."); *Jacobson v. Implement Dealers Mut. Ins. Co.*, 196 Mont. 542, 640 P.2d 908 (1982) (statute requires all automobile insurance policies contain uninsured motorist coverage; citing to cases making coverage "person oriented," court held exclusion void because it

As the Michigan Supreme Court stated in *Bradley v. Mid–Century Ins. Co.*, 409 Mich. 1, 24, 294 N.W.2d 141, 145 (1980), "[t]he coverage is portable: The insured and family members are covered not only when occupying the covered vehicle, but also when in another automobile, and when on foot, on a bicycle or even sitting on a porch."

The status of the named insured and his relatives as persons insured against negligent uninsured motorists is not altered by there being other family vehicles having no uninsured motorist coverage. They acquire their insured status when coverage is purchased for any household vehicle. Thereafter, they are insured no matter where they are injured. They are insured when injured in an owned vehicle named in the policy, in an owned vehicle not named in the policy, in an unowned vehicle, on a motorcycle, on a bicycle, whether afoot or on horseback or even on a pogo stick. *Id.* at 38, 294 N.W.2d at 152.

What is so striking about *Imgrund* and *Deel* is the fact that neither so much as even acknowledges this most basic aspect of the Court's prior holding in *Bell*. Importantly, the term "insured," defined in § 33–6–31(c) and interpreted by *Bell*, was employed in the 1982 amendments to subsection (b) of the statute, which require insurers to offer the prescribed uninsured and underinsured coverages. 1982 W.Va. Acts ch. 106. By using consistent terminology, the Legislature obviously intended that the scope of these "optional" coverages would be no less broad than what had previously been determined in *Bell* to apply to mandatory uninsured coverage.

Both *Imgrund* and *Deel* contain statements to the effect that there is some distinction to be drawn between mandatory coverages that must be provided without exception (*i.e.*, mandated minimum uninsured coverage), and other coverages that need only be offered to the insured ("optional" uninsured and underinsured coverages). *Imgrund*, 199 W.Va. at 192–93, 483 S.E.2d at 538–39; *Deel*, 181 W.Va. at 463, 383 S.E.2d at 95. This is, however, a wholly irrelevant distinction from the standpoint of the policyholder: while the insured may have the option of accepting or declining the non-mandatory coverages set forth in § 33–6–31(b), the fact remains that automobile insurers are bound by law to offer them. I simply fail to see how the Legislature was any less determined to provide the public with meaningful "optional" coverages, than it was to mandate a minimal level of uninsured coverage.

Finally, this case, as did *Imgrund* and *Deel* before it, misapprehends the effect of subsection (k) of § 33–6–31. That subsection provides as follows:

> Nothing contained herein shall prevent any insurer from also offering benefits and limits other than those prescribed herein, nor shall this section be construed as pre-

reduces the scope of coverage required by statute, and is contrary to public policy); *Harvey v. Travelers Indem. Co.*, 188 Conn. 245, 449 A.2d 157 (1982), *partially superseded by statute as stated in Travelers Ins. Co. v. Kulla*, 216 Conn. 390, 579 A.2d 525 (1990) (exclusion was void as against public policy because the coverage required by the uninsured motorist statute is "person oriented" rather than "vehicle oriented"); *Bradley v. Mid–Century Ins. Co.*, 409 Mich. 1, 294 N.W.2d 141 (1980) (uninsured motorist "coverage is portable;" "owned vehicle exclusion" declared invalid); *Squire v. Economy Fire & Cas. Co.*, 69 Ill.2d 167, 13 Ill.Dec. 17, 370 N.E.2d 1044 (1977) (exclusion is void to the extent it makes coverage dependent upon insured being in a vehicle listed in the policy, since the uninsured motorist statute requires coverage regardless of the vehicle being driven); *State Farm Auto. Ins. Co. v. Reaves*, 292 Ala. 218, 292 So.2d 95 (1974) (owned-but-not-insured exclusion was invalid because statute "mandates uninsured motorist coverage for 'persons insured thereunder' in the

policy"); *Bass v. State Farm Mut. Auto. Ins. Co.*, 128 Ga.App. 285, 196 S.E.2d 485, *aff'd in part, rev'd in part on other grounds*, 231 Ga. 269, 201 S.E.2d 444 (1973) (in underinsured motorist coverage, "the named insured is covered wherever he is, whether in that car, another car or no car;" exclusion of coverage for "occupying … a vehicle owned by the named insured … if such vehicle is not an insured automobile" was void as contrary to the uninsured motorist statute). *See also* 1 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 4.2, at 60–61 (2d ed. 1992) ("Persons who are either named insureds or family members residing with a named insured … are afforded relatively comprehensive protection by the provisions used in most uninsured motorist insurance coverages." As insureds they "are protected when they are operating or are passengers in a motor vehicle, as well as when they are engaged in any other activity such as walking, riding a bicycle, driving a hay wagon, or even sitting on a front porch.")

venting any insurer from incorporating in such terms, conditions and exclusions as may be consistent with the premium charged.

Subsection (k) was added to the statute in 1979, after the Court's decision in *Bell.* The first clause of the subsection straightforwardly permits insurers to "offer[ ] benefits and limits other than those prescribed [in § 33–6–31]." This language obviously permits an automobile insurer to *"offer"* any type of coverage (together with particular policy limits) that it chooses.[3] It is therefore easily conceivable that an insurer could offer, *in addition* to the required offerings set forth in subsection (b) of the statute, other forms of coverage, including alternative uninsured or underinsured protection. What this language clearly does not sanction, however, is an automobile insurer failing in the first instance to present consumers with the prescribed optional coverages.

The more crucial question in interpreting subsection (k) is whether the second clause of the statute merely applies to the subject of the first clause—to the "benefits and limits other than those prescribed herein"—or whether it instead has freestanding significance such that insurers have broad authority to impose exclusions upon all motor vehicle coverages, even the "optional" uninsured and underinsured coverages required under subsection (b). The *Deel* Court apparently chose the latter construction.

*Deel* misconstrued the second clause of subsection (k), an error that has been repeated in subsequent cases.[4] This result is perhaps explained in no small part by the fact that the *Deel* Court misapprehended the relevant statutory language. The opinion, in fact, misquotes the second clause of subsection (k), by omitting the crucial word "in." *Deel,* 181 W.Va. at 463, 383 S.E.2d at 95. Although not a model of textual clarity, the word "in" was plainly intended to be synonymous with "therein," which in effect limits

the second clause to the subject of the first. Subsection (k) therefore merely permits an insurer to impose "terms, conditions and exclusions" upon "benefits and limits other than those prescribed herein." In other words, the statute allows an insurer to impose limitations or exclusions on offerings that are otherwise not specified in the statute. There is simply nothing in this language that could, by any stretch of the imagination, be construed to permit an insurance company to corrupt or curtail the coverages specifically prescribed in subsection (b), regardless of whether those coverages are mandatory or optional to the policyholder.

The construction of subsection (k) that I put forward here is certainly no less plausible than that placed upon it by *Deel* and its progeny. As the Court stated in syllabus point 7 of *Perkins v. Doe,* 177 W.Va. 84, 350 S.E.2d 711 (1986), "[t]he uninsured motorist statute, West Virginia Code Sec. 33–6–31 (Supp.1986), is remedial in nature and, therefore, must be construed liberally in order to effect its purpose." Consequently, to the extent there is any ambiguity in subsection (k), the statute must be construed in favor of securing for automobile insurance consumers the opportunity to obtain the optional coverages specified in subsection (b) *without* the inclusion of "terms, conditions and exclusions" that otherwise conflict with the statute.

Any other construction would, in effect, render the provisions of subsection (b) nugatory, since an automobile insurer would otherwise be free to disregard, through the inclusion of onerous policy exclusions, even those coverages specifically required by the statute. *See Brooks v. City of Weirton,* 202 W.Va. 246, 256, 503 S.E.2d 814, 824 (1998) (" 'It is always presumed that the legislature will not enact a meaningless or useless statute.' ") (quoting syl. pt. 4, *State ex rel. Hardesty v. Aracoma–Chief Logan No. 4523, Veterans of Foreign Wars of the United*

---

**3.** Of course, automobile insurers are not free to offer any lesser form of uninsured coverage than that mandated in the first clause of § 33–6–31(b).

**4.** For example, the majority in this case reads the second clause of subsection (k) such that it "permits insurers to 'incorporat[e] in [policies of mo-

tor vehicle insurance] such terms, conditions and exclusions as may be consistent with the premium charged.' " Majority op. at 46, 537 S.E.2d at 892 (quoting W. Va.Code § 33–6–31(k)) (alterations in original). There is no textual support for this construction, and one may only surmise that it was chosen to be consistent with *Deel.*

*States,* 147 W.Va. 645, 129 S.E.2d 921 (1963)). Indeed, if the Court is to continue construing subsection (k) as giving insurers the ultimate trump card, there is no logical reason for not overruling *Bell* to the extent that even mandatory uninsured coverage may be subject to nullifying exclusions.

I would instead overrule *Imgrund* and *Deel,* and hold that an owned-but-not-insured exclusion is invalid as against public policy except where an automobile insurer can demonstrate that (1) the policyholder was first offered the prescribed optional coverages without the exclusion; (2) the potential consequences of accepting a policy containing such an exclusion was explained to the policyholder in clear and understandable terms; (3) the policyholder's acceptance of the exclusion resulted in an actuarially appropriate reduction in the premium charged by the insurer; and (4) the amount of the savings obtained by the policyholder through incorporation of the exclusion was made known at the time of acceptance.

I would therefore reverse the circuit court's award of summary judgment on the basis that there is nothing in the record showing that Anthem made such offers of proof. Because the analytical approach taken by the majority only compounds fundamental errors already evident in this Court's past treatment of this subject, I concur only in the basic result reached in this case.