567 S.E.2d 641

**CONSECO FINANCE SERVICING CORP., Plaintiff,**

v.

**Virgil MYERS, Beverly Myers and Matthew Myers, Defendants/Third–Party Plaintiffs,**

v.

**The Home Show, Inc., and CMH Manufacturing, Inc., Steven Allred, Commissioner of the West Virginia Department of Labor, Third–Party Defendants.**

No. 30089.

Supreme Court of Appeals of West Virginia.

Submitted June 4, 2002.

Decided July 1, 2002.

Daniel F. Hedges, Esq., Bren J. Pomponio, Mountain State Justice, Inc., Charleston, West Virginia, Attorneys for V., B. & M. Myers.

Thomas H. Vanderford, IV, Esq., Pauley, Curry, Sturgeon & Vanderford, Charleston, West Virginia, Attorney for The Home Show.

Jeffrey A. Kimble, Esq., Robinson & McElwee, Clarksburg, West Virginia, Attorney for CMH, Inc.

Erik T. Engle, Esq., Pullin, Knopf, Fowler & Flanagan, Charleston, West Virginia, Attorney for Steven Allred, Comm'r.

John R. Teare, Jr., Bowles Rice McDavid Graff & Love, PLLC, WV Manufactured Housing Assoc., for Amicus Brief.

MAYNARD, Justice:

In this case, the Circuit Court of Kanawha County has certified four questions to this Court. The certified questions and the circuit court's answers are as follows:

1. Does 42 C.S.R. § 19–13, now codified in West Virginia Code § 21–9–11a, impose a duty on the West Virginia Division of Labor, upon receipt of a consumer complaint, to conduct a complete investigation on every new manufactured home's construction, assembly and installation relative to compliance with state and federal standards and the installation manual?

Answer of the circuit court: Yes.

2. Does 42 C.S.R. § 19–13, now codified in West Virginia Code § 21–9–11a, impose a duty on the West Virginia Division of Labor to provide to the consumer a written report, following investigation of defects in a manufactured home's construction and assembly and as the result of the installation process?

Answer of the circuit court: Yes.

3. Does 42 C.S.R. [§ ] 19–13, now codified in West Virginia Code § 21–9–11a, impose a duty on the West Virginia Division of Labor (a) to direct thorough investigations by inspectors with all necessary tools and equipment, (b) to direct any responsible party to correct any discovered

serious defect or imminent safety hazard within a short period of time or face immediate sanctions, and (c) to reinspect each home to ensure those defects and hazards have been eliminated?

Answer of the circuit court: Yes.

(4) Does West Virginia Code § 21-9-10(b) and 42 C.S.R. § 19-15 impose a duty or permit the West Virginia Division of Labor to pay for damages out of the State Manufactured Housing Recovery Fund for failure of the manufacturer, the installer, or the inspector to comply with federal and state standards in construction, set-up or inspection[?]

Answer of the circuit court: Yes.

We initially must determine whether the matter before us is proper for certification. These certified questions are the result of the circuit court's denial of the motion for partial summary judgment for declaratory relief of the defendants/third-party plaintiffs.

West Virginia Code, 58-5-2 (1967), allows for certification of a question arising from a denial of a motion for summary judgment. However, such certification will not be accepted unless there is a sufficiently precise and undisputed factual record on which the legal issues can be determined. Moreover, such legal issues must substantially control the case.

Syllabus Point 5, *Bass v. Coltelli,* 192 W.Va. 516, 453 S.E.2d 350 (1994).[1] Although some facts of this case are disputed, we believe that there is a sufficiently precise and undisputed factual record upon which the legal issues can be determined. We further believe that these legal issues substantially control the case. Accordingly, we find that these questions are properly certified under W.Va.Code § 58-5-2 (1998), and that this Court has jurisdiction to consider these questions.[2]

## I.

### FACTS

On or about September 25, 1995, a Retail Installment Contract was executed wherein The Home Show, Inc., a third-party defendant below, agreed to sell a 1996 Henderson manufactured home to the Keetens and/or the Myers, defendant/third-party plaintiffs herein. Whether the Keetens actually purchased the home or merely co-signed the loan for the purchase on behalf of the Myers is an issue in dispute but which is not relevant to the issues before this Court.[3] The purchasers agreed to make 300 consecutive monthly payments of $409.72 to begin on October 20, 1995 to repay the financed sum of $44,228.25 at 10.25% interest. Also, the purchasers granted The Home Show a purchase money security interest in the mobile home which The Home Show subsequently assigned to Conseco Finance Servicing Corp. The manufactured home was thereafter occupied by defendants/third party plaintiffs herein, Virgil Myers, Beverly Myers, and Matthew Myers.

On August 26, 1999, Conseco sued the Myers claiming default in the payment obligations by failing to timely pay the installments due in April, May, and June 1999 so that the account was now in arrears in the amount of $1,243.88. Conseco requested that it be awarded immediate possession of the manufactured home.

The Myers filed a counterclaim in which they alleged fraud and conspiracy, fraud and unfair and deceptive practices, unconscionable contract, lack of cosigner disclosure, debt collection violation, and breach of implied warranties. Some of these claims arose from the Myers' allegation that the Keetens were supposed to have been only co-signers on the purchase of the home and that the Myers were the true buyers.

---

1. W.Va.Code § 58-5-2 was amended in 1998. The amended statute also provides for "[a]ny question of law ... upon the sufficiency of a motion for summary judgment where such motion is denied" to be certified to this Court.

2. We note at this time the helpful contribution of the West Virginia Manufactured Housing Association who filed an amicus curiae brief in this case. This Court appreciates the Association's input and we have considered it in making our decision.

3. The Keetens are Mrs. Myers' brother and sister-in-law.

On March 20, 2000, the Myers were granted leave to file a third-party complaint against The Home Show, Inc., who was the seller of the manufactured home, and CMH Manufacturing, Inc., the manufacturer of the home, in which the Myers alleged essentially the same causes of action as contained in their counterclaims against Conseco.

On December 20, 2000, the Myers were again granted leave to amend and supplement their third-party complaint by adding Steven Allred, Commissioner of the West Virginia Department of Labor ("the Commissioner") as a third-party defendant. They alleged that the Commissioner failed to enforce state standards with respect to the set up and delivery of the manufactured home in violation of W.Va.Code § 21–9–1 et seq. According to the Myers, they made a complaint to the Department of Labor during the period February 1999 through May 1999, and the Department investigated the complaint, required certain corrections, and ignored or failed to require correction of others. The Myers requested that the Commissioner be enjoined from refusing to enforce State law and standards with regard to setup of manufactured homes, and that the Myers be offered monetary relief from the State Manufactured Housing Recovery Fund for damages as a result of their defective manufactured home.

By order of March 1, 2001, the circuit court certified the four questions set forth above to this Court. In its certifying order, the circuit court found as undisputed that:

3. ... [the Myers] forwarded a complaint to the West Virginia Board of Manufactured Housing Construction and Safety ("Board"), under the Division of Labor, pursuant to the complaint procedure (42 C.S.R. § 19–13) on January 29, 1999.

4. On February 25, 1999 the Board forwarded a copy of the complaint and notification to the seller and manufacturer.

5. Pursuant to the residents' complaint, the Board sent a Compliance Officer to the home and did an inspection on March 2, 1999.

6. As a result of the inspection on May 10, 1999, the Board gave notice to the seller but not to the consumer of certain defects in the mobile home.[4]

7. The seller contends that it repaired the mobile home on May 19, 1999.[5]

8. The Board did a reinspection and made findings thereon on May 27, 1999. No notice thereof was provided to the [Myers].[6]

9. The third party plaintiffs contend that the damage and defects have not been repaired.

(Citations omitted and footnotes added).

We now proceed to address the certified questions.

## II.

## STANDARD OF REVIEW

■ "The appellate standard of review of questions of law answered and certified by a circuit court is de novo." Syllabus Point 1, *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996).

## III.

## DISCUSSION

The first question we are asked by the circuit court is:

Does 42 C.S.R. § 19–13, now codified in West Virginia Code § 21–9–11a, impose a duty on the West Virginia Division of La-

---

4. The specific defects found by the compliance officer were that the third and fourth piers from the end on the back side of the home were leaning; the marriage line pier was not below the frostline and was resting "1/2 off 4" block; and the outrigger was not bolted together.

5. According to The Home Show service order, it:
 1) Straightened (2) piers back side of home # 3 & # 4 from end.

2) Rebuilt marriage wall pier to be below frostline, and to properly support marriage wall at required location.
3) Bolted outriggers as directed.
4) Checked level of home with water level, adjusted level as necessary and verified with the customer.

6. The Board indicated that the three violations originally cited were now in compliance.

bor,[7] upon receipt of a consumer complaint, to conduct a complete investigation on every new manufactured home's construction, assembly and installation relative to compliance with state and federal standards and the installation manual? (Footnote added).

The Myers point us to the specific language of 42 C.S.R. 19–13.5, a rule promulgated by the West Virginia Manufactured Housing Construction and Safety Board, which provides that "[i]f, upon investigation, the Division determines that no violation of *any federal or state manufactured housing standard* has occurred, the Division shall inform the complainant in writing." (Emphasis added). According to the Myers, the phrase "any federal or state manufactured housing standard" indicates that the State inspector is not only to inspect to determine if the specific complaints are valid, but is to perform a thorough inspection to determine if *any* federal or state construction or safety standards have been violated. The Myers aver that, in this case, the West Virginia Division of Labor's ("the Division") inspector conducted a superficial inspection limited to only the defects identified in the Myers' complaint while other significant federal and state violations were not discovered. The Myers ask this Court to declare that the Division of Labor must conduct comprehensive inspections consistent with federal and state standards.

The Commissioner responds that there are two reasons why this question should be answered in the negative. First, prior to conducting an inspection, the Division must first determine whether the complaint is within its jurisdiction. Some complaints fall outside of the Division's jurisdiction in which case "a complete investigation" is not conducted. Second, the regulations merely require an inspection of the matters set forth in the complaint. The regulations state that the investigator will conduct an "investigation and inspection" of the home, but makes no reference to "complete" investigation. Finally, the Commissioner avers that it is the Division's standard operating procedure to, in fact, determine whether the home complies with *all* federal and state standards, but he disagrees that the Division is required by law to do so.

 In determining the scope of the investigation or inspection to be conducted by the Board, we look to the specific language of the applicable statutes and rules. The wording of W.Va.Code § 21–9–11a(a) (2000) refers simply to "an investigation" and "an inspection." Likewise, 42 C.S.R. § 19–13.4 (2002)[8] indicates that "[i]f it appears that the matters raised in the complaint are within the jurisdiction of the Board, the Division shall conduct an investigation and inspection of the manufactured home[.]" Generally, "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syllabus Point 1, *Smith v. State Workmen's Compensation Com'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). Moreover, "[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syllabus Point 2, *State v. Epperly*,

---

7. Although the certified questions herein refer to the duties of the Division of Labor, and the Commissioner of the Division of Labor was made a third-party defendant herein, it is specifically the Manufactured Housing Construction and Safety Board, created by W.Va.Code § 21–9–3 (1992) and continued by the 2002 version of W.Va.Code § 21–9–3, that is responsible for administering the provisions of the Manufactured Housing Construction and Safety Standards Act. *See* W.Va.Code § 21–9–4 (1988). However, pursuant to W.Va.Code § 5F–2–1(b)(1)(A)(ii) (2001), the Division of Labor includes the Board of Manufactured Housing Construction and Safety.

8. At the time these questions were certified to this Court, the 1997 version of Title 42, Series 19 of the Code of State Rules, concerning the West

Virginia Manufactured Housing Construction and Safety Board, was in effect. On July 1, 2002, an amended version of Title 42, Series 19 became effective. A review of the sections of the new rule applicable to this case indicates that they are, for the most part, identical to the 1997 sections with the exception of minor changes in wording which do not effect their substance. This Court will cite to the 2002 amended version of the applicable sections of Title 42, Series 19. When there is a difference between the 1997 version and the 2002 version, we will indicate the changes in a footnote.

The only difference between the 1997 and 2002 versions of § 19–13.4 is that the 2002 version replaces the word "must" with the word "shall" in the language quoted above.

135 W.Va. 877, 65 S.E.2d 488 (1951). We believe that the clear language of W.Va.Code § 21–9–11a does not support the Myers' argument. The statute refers merely to "an investigation," not a "complete investigation," and does not express a legislative intent that a Board inspector who is investigating specific alleged consumer complaints must check to ensure that the manufactured home conforms to *all* federal standards. For us to hold differently would amount to an unwarranted judicial construction of the statute. Accordingly, we answer the first certified question in the negative. However, this does not end our analysis of this issue.

 We have previously recognized that "[a]lthough a provision's language may be plain, there nevertheless may arise circumstances in which the plain language does not speak completely on the subject to which it is addressed." *Mitchell v. Broadnax,* 208 W.Va. 36, 46, 537 S.E.2d 882, 892 (2000). Also applicable is our rule which says, "[t]hat which is necessarily implied in a statute, or must be included in it in order to make the terms actually used have effect, according to their nature and ordinary meaning, is as much a part of it as if it had been declared in express terms." Syllabus Point 14, *State v. Harden,* 62 W.Va. 313, 58 S.E. 715 (1907), *disapproved of on other grounds by Wiseman v. Calvert,* 134 W.Va. 303, 59 S.E.2d 445 (1950). Finally, we have held:

> It is the duty of a court to construe a statute according to its true intent, and give to it such construction as will uphold the law and further justice. It is as well the duty of a court to disregard a construction, though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity.

Syllabus Point 2, *Click v. Click,* 98 W.Va. 419, 127 S.E. 194 (1925).

Applying these principles to the instant facts, we are mindful that a primary purpose of The West Virginia Manufactured Housing Construction and Safety Standards Act is "to promote consumer safety and protect purchasers of manufactured housing[.]" W.Va.

Code § 21–9–4 (1988). Toward this end, 42 C.S.R. § 19–13.3 (2002) contemplates that the Board receive complaints indicating the possible existence of a noncompliance, defect, serious defect or imminent safety hazard under the federal standards. According to 42 C.S.R. § 19–3.19 (2002), an "imminent safety hazard means a hazard that presents an imminent and unreasonable risk of death or severe personal injury that may or may not be related to a failure to comply with an applicable federal standard." "Serious defect" is defined by 42 C.S.R. § 19–3.33 (2002) [9] in part, as "any failure to comply with an applicable federal standard ... which results in an unreasonable risk of injury or death to occupants of the affected manufactured home."

 As noted by the Meyers, it is certainly foreseeable that an occupant of a manufactured home may observe, and thus complain of, a noncompliance with a federal standard, but fail to observe and complain of a condition of his or her manufactured home which causes an unreasonable risk of injury or death to the occupants of the home. It would be absurd under these circumstances to suppose that the Legislature intended a Board inspector to conduct a search strictly limited to the noncompliance alleged in the consumer's complaint when a slightly more extensive inspection would have revealed to the trained eye of the inspector a potentially harmful or fatal defect. Therefore, this Court does not believe that an inspection of a manufactured home which is strictly limited to alleged noncompliances is sufficient. As stated above, however, we also do not agree that an inspector has the onerous task of checking for every conceivable noncompliance with federal standards. Rather, in light of the Act's purpose to protect consumers of manufactured homes, we believe that a Board inspector who is investigating consumer complaints has a duty to reasonably inspect a manufactured home for serious defects or imminent safety hazards. Accordingly, we hold that when a purchaser or owner of a manufactured home files a writ-

**9.** The definition of "serious defect" found in 42 C.S.R. § 19–3.33 (2002) is identical to the definition of "serious defect" found in § 19–3.30 (1997).

ten complaint with the West Virginia Manufactured Housing Construction and Safety Board alleging defects in the manufacture, construction or installation of his or her manufactured home, and the Board causes an inspection of the manufactured home by one or more of its employees or person authorized or supervised by the Board, pursuant to W.Va.Code § 21–9–11a (2000), the Board inspector has a specific duty to reasonably inspect the alleged defects or non-compliances complained of by the purchaser. In addition, the Board inspector has a duty to further reasonably inspect the manufactured home for the existence of other serious defects or imminent safety hazards which present an unreasonable risk of death or severe personal injury to the occupants of the home. For example, an inspector who investigates a complaint that a door is unaligned or a window will not open properly should also reasonably inspect to ensure the structural integrity of the home, that electrical wiring is in compliance with the applicable regulations, and that there are no major fire standard violations.

The second question certified is:

Does 42 C.S.R. § 19–13, now codified in West Virginia Code § 21–9–11a, impose a duty on the West Virginia Division of Labor to provide to the consumer a written report, following investigation of defects in a manufactured home's construction and assembly and as the result of the installation process?

The Myers contend that while the Division's regulations do not require that a written report be sent to the consumer in cases where defects are discovered, W.Va.Code § 21–9–11a(a) (2000) does contain such a requirement. Further, say the Myers, due process requires that a government agency charged with investigating a consumer complaint provide notice of the results of the investigation to the complainant. The Myers note that they received no notice of the defects in their home from the Division, and ask this Court to declare that the Division is required to provide consumers with a written report each time an inspection or reinspection occurs in response to a consumer complaint.

The Commissioner responds that at the time of the Myers' inspection, the division was under no duty to provide them with a notice of defects. However, in light of the 2000 amendment to W.Va.Code § 21–9–11a, written notification and copies of reports prepared following an inspection are provided to consumers. Therefore, the Commissioner agrees that the answer to this question should be "yes."

██ We can dispense with this issue fairly quickly. As noted by both parties, W.Va.Code § 21–9–11a(a) (2000) provides:

When a purchaser or owner of a manufactured home files a written complaint with the board alleging defects in the manufacture, construction or installation of the manufactured home, and any additional information the board considers necessary to conduct an investigation, the board shall within sixty days, to the extent feasible, cause an inspection of the manufactured home by one or more of its employees or person authorized and supervised by the board. *The board shall provide the consumer a written report indicating whether the defects alleged by the complaint constitute violations of federal or state statutory or regulatory standards or good and customary manufacturing standards in the construction, design, manufacture or installation of the manufactured home.* If the report indicates that the alleged defects do constitute any of these violations, the board shall take such further administrative action as provided for in this article including, but not limited to, ordering the manufacturer, dealer or contractor to correct any defects. (Emphasis added).

As noted by the Commissioner, at the time the Myers' home was inspected, no rule or statute mandated that the Division of Labor provide the Myers with a written notification of defects. Rather, 42 C.S.R. § 19–13.6 (1997)[10] specified only that all responsible

10. The 1997 version of § 19–13.6 states that "[t]he licensee receiving a Notice of Violation shall be afforded not longer than thirty (30) cal-

ender days from receipt of notice to correct the violations." The 2002 version of this section rewords this sentence to read, "[t]he Board shall

licensees were to receive a notice of violations. However, in 2000, W.Va.Code § 21–9–11a was amended to provide for notice to the consumer. We hold, therefore, that when a purchaser or owner of a manufactured home files a written complaint with the West Virginia Manufactured Housing Construction and Safety Board alleging defects in the manufacture, construction or installation of his or her manufactured home, and the Board causes an inspection of the manufactured home by one or more of its employees or person authorized and supervised by the Board, W.Va.Code § 21–9–11a (2000) imposes a duty on the Board to provide to the purchaser or owner a written report indicating whether the defects alleged by the purchaser's or owner's complaint or other defects discovered in the course of the inspection constitute violations of federal or state statutory or regulatory standards or good and customary manufacturing standards in the construction, design, manufacture or installation of the manufactured home. Accordingly, we answer the second certified question in the affirmative.

The third question which we must answer is:

> Does 42 C.S.R. [§ ] 19–13, now codified in West Virginia Code § 21–9–11a, impose a duty on the West Virginia Division of Labor (a) to direct thorough investigations by inspectors with all necessary tools and equipment, (b) to direct any responsible party to correct any discovered serious defect or imminent safety hazard within a short period of time or face immediate sanctions, and (c) to reinspect each home to ensure those defects and hazards have been eliminated?

The Myers assert that the Division inspector who inspected their home was equipped with only a clipboard and a pen. They contrast this fact with the opinion of their expert who says that an inspector needs a folding ladder; a battery-powered screwdriver; a small laser level; a mirror for inspecting the inside of conditioned air ducts; a "zip-lock" type tool for unlatching and latching joints in

horizontal vinyl siding; a 16–inch–long section of anchor strap for checking the sealing and/or fastening of joints between walls and floors; a 100–foot tape measure; a 12–foot–long and 3/4–inch–wide tape measure; and a heavy-duty, wide-beam flashlight or lantern. The Myers urge this Court to declare that necessary tools and equipment are necessary for the Division to fulfill its duty. Second, the Myers contend that the Division must follow up inspections within a short period of time by directing responsible parties to correct any defects found and to provide a sanction when the party fails to comply. The Myers aver that, in this case, the Division issued a notice of violation to the responsible parties, but nothing else was done. Third, the Myers argue that the Division has a duty to reinspect the home. Here, they say, the responsible party claimed that the defects were corrected when, in fact, they were not.

The Commissioner agrees with the Myers that, pursuant to state regulations, the Division is to direct the responsible party to correct any defect. Further, while there is no regulation that requires reinspection, it is the policy of the division that reinspection shall be completed following the responsible party's claim of repair. Therefore, the Commissioner agrees with the Myers on parts (b) and (c) of the above question. Concerning part (a) of the question, the Commissioner says he has no problem with the Court declaring that "necessary tools are necessary" but he does have a problem with the Court defining what are necessary tools. This is because there is no legal rule defining what necessary tools are. Instead, there is only the word of the Myers' expert who the Commissioner has never had the opportunity to depose concerning his qualifications or the basis for his opinions.

■■■ Part (a) of the certified question asks whether the applicable rule and statute impose a duty on the Board to direct investigations by inspectors with all necessary tools and equipment. The applicable statutes and rules do not specifically address this issue. Again, however, that which is necessarily

afford the licensee receiving a Notice of Violation no longer than thirty (30) calender days from

receipt of notice to correct the violations."

implied in a statute in order to give the statute effect is as much a part of it as if it had been declared in express terms. When the Legislature directed Board inspectors to inspect manufactured housing, it is presumed that it intended such inspections to be effective. We believe that an inspection cannot be effective if the inspector does not have the necessary tools. Therefore, we find that the Board has a duty to direct its inspectors to conduct their inspections with all necessary tools and equipment. Accordingly, we answer part (a) of the third certified question in the affirmative.

■ Part (b) of the third certified questions asks whether the Board has a duty to direct any responsible party to correct any discovered serious defect or imminent safety hazard within a short period of time or face immediate sanctions. It is generally provided for in W.Va.Code § 21–9–11a(a) that if, upon inspection, alleged defects constitute violations of federal or state statutory or regulatory standards or good and customary manufacturing standards, "the board shall take such further administrative action as provided for in this article including, but not limited to, ordering the manufacturer, dealer or contractor to correct any defects." Specifically, 42 C.S.R. §§ 19–13.3 through 19–13.7 set forth the Board's procedures for processing complaints. According to § 19–13.6 (2002),[11]

> If, upon investigation, the Division determines that a violation of any matter within the Board's jurisdiction ... has occurred, the Division shall issue a Notice of Violation to any and all responsible licensees, specifying the condition found and the legal standard violated.... The Board shall afford the licensee receiving a Notice of Violation no longer than thirty (30) calendar days from receipt of notice to correct the violations.

Pursuant to § 19–13.7 (2002),[12] persons contesting the issuance of a Notice of Violation may request an informal presentation of views within ten days of receiving the Notice of Violation, and the informal presentation of views shall be scheduled within fifteen days of receipt of the request. Further, the time specified in the Notice to correct the violations is stayed pending the informal presentation of views *except when imminent safety hazards or serious defects are involved.* Thus, the rules recognize that those defects or hazards that present an imminent and unreasonable risk of death or severe personal injury shall be corrected within 30 days, and this time period shall not be stayed.

Moreover, W.Va.Code § 21–9–12 (1996) provides for civil and criminal penalties for persons who violate any of the provisions relating to manufactured homes set forth in the statute or rules. According to 42 C.S.R. § 19–14.1 (2002), the Board may impose sanctions upon any licensee for "(b) the failure to furnish notification and correction of any defect ..." and "(v) the failure to comply with any order issued by the Board, or any settlement agreement with the Board or Division[.]" In sum, we believe that the applicable statute and rules provide that the Board has a duty to direct responsible parties to correct serious defects or imminent safety hazards within a short period of time or face immediate sanctions. Accordingly, we answer part (b) of the third certified question in the affirmative.

■ This brings us to part (c) of the third certified question which is whether the Board has a duty to reinspect each home to ensure that defects and hazards have been eliminated. As noted above, although a duty to reinspect is not expressly set forth in the statute or rules, the Commissioner avers that it is the policy of the Division that reinspection shall be completed following the responsible party's claim of repair. Further, we believe that the applicable rules imply this. For obvious reasons, it is of the utmost importance that serious defects and imminent safety hazards are corrected in a short peri-

11. *See* footnote 10, *supra.*

12. There is a stylistic change in the 2002 version of § 19–13.7. Specifically, the 1997 version said, "[f]ailure to timely request an informal presentation of views shall result in the Notice of Violation becoming a final order to the Board." According to the 2002 version, "[i]f any person fails to timely request an informal presentation of views the Notice of Violation becomes a final order of the Board."

od of time. To ensure that these defects and hazards are properly corrected and that all unreasonable risks of death or serious injury to occupants of manufactured homes are quickly and effectively eliminated, it is incumbent upon the Board not simply to accept the word of the responsible party that the defects or hazards have been eliminated but to conduct a follow-up inspection to confirm that such is the case. Therefore, we answer part (c) of the third certified question in the affirmative.

■ Accordingly, in light of the above, we hold that W.Va.Code § 21–9–11a (2000) and the applicable rules promulgated by the West Virginia Manufactured Housing Construction and Safety Board impose a duty on the Board to direct that, when the Board causes an inspection and investigation of alleged defects in the manufacture, construction or installation of a manufactured home to be conducted: (a) the inspection and investigation shall be performed with necessary tools and equipment; (b) any responsible party shall correct any discovered serious defect or imminent safety hazard within the time limits provided in 42 C.S.R. § 19–13.6 (2002) or face immediate sanctions; and (c) the manufactured home shall be reinspected to ensure that the defects and hazards have been eliminated.[13]

The fourth and final question for our attention is:

Does West Virginia Code § 21–9–10(b) and 42 C.S.R. § 19–15 impose a duty or permit the West Virginia Division of Labor to pay for damages out of the State Manufactured Housing Recovery Fund for failure of the manufacturer, the installer, or the inspector to comply with federal and state standards in construction, set-up or inspection[?]

The Myers argue that the intended beneficiaries of the State Manufactured Housing Recovery Fund ("Recovery Fund" or "Fund") are denied meaningful access to the Fund by impermissible regulatory exclusions of actual damages.[14] The Myers cite language from 42 C.S.R. § 19–15.8 [15] which specifically provides:

Payments from the recovery fund are limited to actual expenses incurred, as determined by the Board. The recovery fund may not be used to pay for any incidental expenses of the consumer, including claims for personal injuries, claims for property damage other than to the home itself, inconvenience, alternate housing, attorney's fees, punitive or exemplary damages, or other legal or court costs.

According to the Myers, this regulation is in direct conflict with W.Va.Code § 21–9–10(b) which provides that money in the fund shall cover any misappropriation of funds; any deception or false or fraudulent representation or deceitful practice in the sale; any failure by licensee to fulfill warranty obligations; any failure to comply with federal standards; and any failure to comply with the statute or rules or regulations.

Concerning the nature of the Recovery Fund, W.Va.Code § 21–9–10(a) (2002) provides:

13. As noted previously, according to 42 C.S.R. § 19–13.6 (2002), "[t]he Board shall afford the licensee receiving a Notice of Violation no longer than thirty (30) calendar days from receipt of notice to correct the violations." Section 19–13.7 (2002) further provides, however, that "[e]xcept when imminent safety hazards or serious defects are involved, the time specified in the Notice of Violation to correct the violations is stayed pending the informal presentation of views[]" of the person issued the Notice.

14. The Myers make several other arguments concerning the fourth certified question. They aver that over the past three years there have been meager and infrequent distributions from the Recovery Fund, and that this stingy use of the Fund benefits mobile home dealers who are not required to contribute to the Fund as long as it contains at least $300,000. Next, the Myers aver that the Division lacks a procedure for providing consumers with meaningful access to the Recovery Fund. In support of this assertion, they allege that the Fund contains over $1.2 million dollars and continues to increase annually. Moreover, they complain that payments from the Fund go directly to manufactured housing licensees. Finally, they complain that the Board discriminates against complainants who have retained counsel. We find that it is not necessary to address these arguments in order to answer the fourth certified question. Further, for the most part these arguments concern disputed facts which are not appropriate for disposition on a certified question.

15. The 1997 and 2002 versions of § 19–15.8 are identical.

(a) Each manufacturer, dealer, distributor or contractor which applies for a licensee [sic] under section nine of this article shall, at the time of making application for the license, furnish a surety bond or any other form of assurance of the applicant's financial responsibility permitted by the board by rule or regulation, the surety bond or other form of assurance to be in the amount prescribed by rule or regulation. In the event of forfeiture of any bond or security, the proceeds thereof shall be deposited in the special account created under section nine of this article.

The special account is created in W.Va.Code § 21–9–9(g) (1992), and it contains, in addition to the proceeds of forfeitures of bonds and security, license fees paid annually by manufacturers, dealers, distributors, and contractors of manufactured homes. *See* W.Va. Code § 21–9–9.

Further, 42 C.S.R. § 19–15.1 (2002) creates the State Manufactured Housing Recovery Fund within the special treasury account described in W.Va.Code § 21–9–9(g). Pursuant to § 19–15.4 (2002) all assessment fees in satisfaction of each licensed manufacturer's, dealer's, distributor's or contractor's required assurance of financial responsibility shall be paid into the Recovery Fund. In addition, § 19–15.5 (2002) provides that all fines paid to the Board pursuant to any disciplinary action shall be deposited in the Fund. Finally, § 19–15.6(b) (2002) provides:

When a licensee fails to make repairs to a manufactured home as directed by the Board, or as agreed between the licensee and the Board or Division, the Board may determine the fair market value of the cost of obtaining those repairs and contract with a third party licensee to effect those repairs.

As noted above, the Myers challenge the provisions of 42 C.S.R. § 19–15.8 which limit payments from the recovery fund to actual expenses incurred and claim that this rule conflicts with W.Va.Code § 21–9–10(b). However, while this case was pending in this Court, the Legislature amended W.Va.Code § 21–9–10(b) to incorporate the provisions of 42 C.S.R. § 19–15.8 complained of by the Myers. Specifically, W.Va.Code § 21–9–

10(b), passed by the Legislature on March 9, 2002, approved April 2, 2002, and effective 90 days from passage, now provides in applicable part:

That any payment to purchasers or prospective purchasers by the board from licensee bonds or other forms of financial assurance shall not include punitive or exemplary damages, any compensation for property damage other than to the manufactured home, any recompense for any person [sic] injury or inconvenience, any reimbursement for alternate housing, or any payments for attorney fees, legal expenses or court costs.

This new statutory provision is clear and unambiguous and plainly expresses the legislative intent to limit payments from the Recovery Fund as indicated. When the Legislature thus expresses its intent, we do not interpret the provision but, instead, give it full force and effect. We therefore find no merit to the Myers' challenge to the limitations on payments from the Recovery Fund. Accordingly, we hold that W.Va.Code § 21–9–10(b) (2002) clearly provides that any payment to purchasers or prospective purchasers of manufactured homes by the West Virginia Manufactured Housing Construction and Safety Board, from licensee bonds or other forms of financial assurance provided by manufacturers, dealers, distributors or contractors of manufactured homes pursuant to W.Va.Code § 21–9–10, shall not include punitive or exemplary damages, any compensation for property damage other than to the manufactured home, any recompense for any personal injury or inconvenience, any reimbursement for alternate housing, or any payments for attorney fees, legal expenses or court costs. In light of the discussion above, we answer the fourth certified question in the negative.

Finally, we note that, although purchasers and prospective purchasers of manufactured homes cannot collect the above-mentioned damages from the Recovery Fund, W.Va. Code § 21–9–10(b) does not prohibit the award of such damages from manufacturers, distributors, dealers or contractors in circuit court. According to 42 C.S.R. § 19–15.11 (2002), "[n]othing in this rule shall be con-

strued to limit or restrict in any manner other civil or criminal remedies available under the law to any person." Further, W.Va. Code § 21–9–11a(b) (2000) only prevents the filing of any civil action seeking recovery or damages for claims related to or arising out of the manufacture, acquisition, sale or installation of a manufactured home until the expiration of 90 days after the consumer or owner has filed a written complaint with the Board.

## IV.

## CONCLUSION

After considering each of the certified questions from the Circuit Court of Kanawha County, we respond as follows:

1. Does 42 C.S.R. § 19–13, now codified in West Virginia Code § 21–9–11a, impose a duty on the West Virginia Division of Labor, upon receipt of a consumer complaint, to conduct a complete investigation on every new manufactured home's construction, assembly and installation relative to compliance with state and federal standards and the installation manual?

ANSWER: No.

2. Does 42 C.S.R. § 19–13, now codified in West Virginia Code § 21–9–11a, impose a duty on the West Virginia Division of Labor to provide to the consumer a written report, following investigation of defects in a manufactured home's construction and assembly and as the result of the installation process?

ANSWER: Yes.

3. Does 42 C.S.R. [§ ] 19–13, now codified in West Virginia Code § 21–9–11a, impose a duty on the West Virginia Division of Labor (a) to direct through [sic] investigations by inspectors with all necessary tools and equipment, (b) to direct any responsible party to correct any discovered serious defect or imminent safety hazard within a short period of time or face immediate sanctions, and (c) to reinspect each home to ensure those defects and hazards have been eliminated?

ANSWER: Yes.

4. Does West Virginia Code § 21–9–10(b) and 42 C.S.R. § 19–15 impose a duty or

permit the West Virginia Division of Labor to pay for damages out of the State Manufactured Housing Recovery Fund for failure of the manufacturer, the installer, or the inspector to comply with federal and state standards in construction, set-up or inspection[?]

ANSWER: No.

Certified questions answered.